CONNOR and others, Respondents. vs. CITY OF MARSHFIELD and others, imp., Appellants.

*March 23—May 8, 1906.*

*Municipal corporations: Purchase of water and lighting plant: Equity of redemption: Submission to popular vote: Statutes construed: Bonds of vendor corporation, when not a municipal indebtedness: Constitutional limitation: Hydrant rentals: Contract for benefit of third person: Reasonableness of purchase: Subsequent deed to third person subject to city's rights: Validity.*

1. Sec. 959—51, Stats. 1898 (sec. 4, ch. 361, Laws of 1897), confers upon a city or village a new and specific authority in a particular case, independent of the power granted in sec. 927—1, *i. e.* the authority to acquire an equity of redemption in a system of waterworks or lighting without becoming liable upon the existing mortgage indebtedness secured upon the plant; and in the absence of any bond issue it is not necessary to submit to a popular vote the question of making a purchase under sec. 959—51, Stats. 1898.

2. The act of 1897, when incorporated into the Revision as sec. 959—51, continued unchanged in meaning.

3. A written contract between a city and a water and lighting corporation required a transfer by the corporation of all its property to the city, subject to a certain mortgage, and payment of a price by the city to the corporation. The property was actually delivered and surrendered by the corporate officers to the posses-

sion and management of the city officers and employees. *Held*, that the transaction constituted a purchase by the city of the equity of redemption in the property of the corporation under sec. 959—51, Stats. 1898, and that the transfer (provided for in the contract) to the city of the corporate stock and unissued bonds of the corporation was not a purchase of either to acquire control of the corporation as contemplated by sec. 927—1, but was merely a method of securing their cancellation.

4. A city purchased a water and lighting plant subject to a mortgage thereon securing bonds issued by the vendor corporation. It did not assume payment of said bonds. Sec. 959—51, Stats. 1898, authorizing purchase of such an equity of redemption, provides that such purchase shall not create any liability on the part of the city to pay bonds so issued "nor shall the amount of such bonds and mortgage . . . be deemed to be an indebtedness" of the city. *Held*, that such bonds are not an indebtedness of the city within the meaning of the constitutional limitation upon municipal indebtedness.

5. Prior to the purchase of the plant the city had contracted with the corporation to pay certain hydrant rentals and, in case the corporation should at any time issue mortgage bonds, to pay directly to the trustee in the mortgage so much of said rentals, when and as they became due, as would discharge the interest on the bonds as it should mature, and to continue such payments so long as said interest should remain due and unpaid. *Held*, that this agreement, being merely a promise to pay for prospective services as they should be performed, did not constitute an indebtedness until such performance; and that the city did not by the purchase of the plant assume any new obligation to the bondholders in respect thereto.

[6. Whether the doctrine that a promise by one, upon good consideration from another, to pay money to a third is irrevocable and impossible of change by the original parties, is applicable to contracts wholly executory upon both sides, not determined.]

7. A finding by the trial court that the purchase by a city for $25,400 of the equity of redemption in a waterworks and lighting plant mortgaged for $125,000, was not, under all the circumstances, an unreasonable and improvident exercise of power, is *held* to be sustained by the evidence.

8. The very broad discretion over questions of policy which is vested in municipal governments will not, under ordinary circumstances, be interfered with by the courts.

9. After contracting to sell to the city the equity of redemption in a water and lighting plant, the vendor corporation gave to a third

person a warranty deed of all the plant, franchises, etc., subject to rights of the city as purchaser. *Held* that, as the corporation had already, by the sale to the city, become relieved from the duties imposed by its original franchise, the transfer of its mere legal title by such warranty was not contrary to public policy.

APPEAL from a judgment of the circuit court for Dane county: E. RAY STEVENS, Circuit Judge. *Reversed.*

Since 1892 or 1893 the defendant *Marshfield Water, Electric Light & Power Company,* hereinafter called the "Company," has maintained in the city of *Marshfield* waterworks and lighting plant under an ordinance, contract, or franchise which provided, among other things, for the payment of hydrant rental in the sum of at least $4,000 per annum, which, at the date of the transactions hereinafter referred to, had been increased by additions to $5,080. The city was also buying light, although not required to do so by contract, in the sum of about $4,000. The ordinance further reserved privilege of purchase by the city by appraisal at certain stated intervals. The company had issued $100,000 of capital stock, most of which was owned by *William H. Upham.* It had mortgaged its plant, franchises, and all rights in the sum of $150,000 to secure bonds, of which $125,000 were outstanding and $25,000 authorized to be issued and countersigned by the trustee, but still in the corporate treasury. In this situation, about December, 1903, negotiations commenced between *Mr. Upham,* who controlled the company and was able to speak for it, and the city, for acquisition by the latter of either the property or the stock. He made certain proposals looking to the transfer of the stock and property to the city, which took advice of counsel as to whether or not it could make purchase, and was advised that under the provisions of sec. 959—51, Stats. 1898, it was empowered to make a purchase of the equity of redemption without submitting the question to a vote of the people. This was followed by expert examination of the property by persons employed by the city for that purpose.

Whereupon, on March 1, 1904, a committee appointed on the subject reported the result of such investigation and their opinion that it would be to the best interest of the city "to own the plant and franchises now held by the [company], and would recommend the purchase at this time at $25,400 for their interest subject to $125,000 of bonds held in the East." Thereupon a resolution was duly adopted authorizing the making of a land contract, a draft of which was before the council, and which ran from the company to the city and provided for the payment by the latter of $25,400, of which $400 was to be paid down and $5,000 at the end of each year thereafter, with six per cent. interest, "to apply when fully completed on the purchase money of the following tract, piece, or parcel of land and personal property situated in the county of Wood and state of Wisconsin." Then follows a description of the entire property of the company, and "also all the $100,000 of capital stock of the said party of the first part, which said stock is to be transferred as follows: [To three designated city officials]—in trust, nevertheless, for the use and benefit of the said city of *Marshfield;*" said property to be transferred "free and clear of all legal liens and incumbrances, except the taxes herein agreed to be paid by the said party of the second part, and except the mortgage of $150,000."

Thereupon the possession of the works was turned over to the city, which works were operated by a commission appointed for that purpose. The stock was assigned according to said contract and the $25,000 of unissued bonds placed in escrow with the defendant Reese, to whom the company made a warranty deed of the property upon his agreement to carry out the land contract with the city. The company thereupon, at directors' meeting, passed a resolution distributing its assets among its stockholders, by virtue of which the money paid by the city was turned over to *Mr. Upham,* who had manual possession of all the stock at the time of the transaction, and who

had delivered it to the city officials. No steps were ever taken by the city to maintain the corporate organization.

After this transfer was complete the plaintiffs, as taxpayers, on behalf of themselves and others similarly situated, commenced this action seeking judgment annulling said land contract and the transfer of the stock, and enjoining the city from making any payments thereon, or from making any payment on the principal or interest of the bonds of the company, and for the return to the city by *William H. Upham* of the $400 cash payment which he had received, and from the company $800 which had been paid in addition for extras, and generally canceling all that had been done. The trial court found substantially the foregoing transactions; that *Marshfield* was a city of the fourth class having about 7,000 inhabitants and existing under the general charter; made certain findings as to the cost and that the fair value of the physical property and franchises belonging to the company at the time of the contract was $100,000; that in view of all the circumstances the purchase was not an unreasonable exercise of power on the part of the city officers. It is conceded to be a fact that the city's indebtedness other than that resulting from this contract was at least $26,000 below its constitutional debt limit. No question in connection with the transaction was submitted to a vote of the people. The court held the whole transaction void on this ground, without deciding other legal questions, and rendered judgment annulling the whole transaction and re-establishing the parties in their original *status quo* by the surrender of all that the city had received and payment by it of the result of an accounting pending its possession and operation of the works, of which in detail no complaint is made. From this judgment the defendants city, company, *William H. Upham,* and certain others appeal.

For the appellants there were briefs signed by *C. B. Edwards* and *George L. Williams,* attorneys for the city of *Marshfield* and others; by *W. A. & E. C. Pors* and *George*

*Lines,* attorneys for *W. H. Upham;* by *Quarles, Spence & Quarles,* attorneys for the *Marshfield Water, Electric Light & Power Company;* and by *George L. Williams* and *George Lines,* of counsel; and the cause was argued orally by *Mr. Lines* and *Mr. Edwards.*

For the respondents there was a brief by *Goggins & Brazeau,* and oral argument by *B. R. Goggins.*

DODGE, J.   1. The first field of discussion by counsel is that of the apparently overlapping provisions of various statutes dealing with the construction or purchase of waterworks and lighting plants by cities, which, it must be confessed, approximate closely to the chaotic condition of those regulating the issue of bonds, commented on in *Appleton W. W. Co. v. Appleton,* 116 Wis. 363, 93 N. W. 262.   One principally debated question in this connection is as to the degree in which sections 927—1 and 959—51, Stats. 1898, affect or control each other.   Sec. 927—1 is substantially, with some slight modifications, a perpetuation of ch. 325, Laws of 1882, ch. 165, Laws of 1883, and ch. 182, Laws of 1895.   After providing for process of condemnation in aid of acquiring waterworks and lighting plants, it provides that:

"Any [such] city or village, when authorized so to do by ordinance adopted by a vote of a majority of all the members of its common council or board of trustees, after such ordinance has been submitted to a vote of the people and a majority have voted in favor thereof, may purchase or lease the waterworks or lighting works, or both, owned by any corporation in such city or village and having a contract therewith for public service, or purchase or lease the interest of such corporation in such works, or obtain the control of such works by purchasing the stock of such corporation and keeping up its organization."

Such law, in addition to any general authority that may have otherwise existed in municipalities, authorized a method of performing the municipal function to provide for protection

against fire and for street lighting, and doubtless subjected that method to the prescribed restrictions and procedure. The legislature, in Laws of 1897, by ch. 361, made certain other provisions in regulation of the obtaining of water and light for cities. The first three sections are in the way of relieving cities and villages from certain then existing limitations upon their power to raise money to pay for water and light supplied by private companies. But the fourth section, now sec. 959—51, provided:

"In all cases where any system of waterworks or lighting has been or may hereafter be constructed in any city or village by any person or corporation and such person or corporation shall have heretofore executed or shall hereafter execute any bond or bonds and secure the payment of the same by a mortgage upon or trust deed of such system of waterworks or lighting, such city or village may purchase of such person or corporation all of the interest and equity of redemption of such person or corporation in such system of waterworks or lighting, or both, and take possession thereof and operate the same. If it shall be necessary or desirable for such city or village, in making such purchase, to issue bonds, the proposition for the purchase of such interest and equity of redemption and the issuing of such bonds shall be submitted to the electors at a special election to be called for that purpose. . . . The purchase by any city or village of the interest and equity of redemption of any person or corporation in any system of waterworks or lighting, as above provided, shall not create any liability on the part of such city or village to pay, satisfy or discharge any bonds issued or any mortgage or trust deed upon such system of waterworks or lighting executed prior to the purchase of such interest and equity of redemption by such city or village, nor shall the amount of such bonds and mortgage or trust deed or any portion thereof be or be deemed to be an indebtedness of or a liability against such city or village."

It will be observed that, while the procedure authorized and regulated by sec. 927—1 is limited to cases where there is an existing service contract between the city and the company, in

other respects it deals generally with any method of acquisition of existing water and light works, whether of the whole title or of the interest of the corporation therein, whether by purchase or leasing, or by taking control and operation of the corporation by purchase of its stock, thus not transferring the plant to the city at all. On the other hand, sec. 959—51 is confined to the one transaction of purchase, and purchase only of an equity of redemption subject to an existing mortgage upon the premises, and, we think, must be considered the more specific of the two. After careful consideration of these statutes we have reached the conclusion, hardly to be aided by statement either of the general rules of law governing statutory construction or of the details of the comparison which have weighed with us, that the act of 1897 was intended to confer a new and independent authority upon the city in a particular case; perhaps not merely authority to purchase an equity of redemption in a plant, for that may have existed before, but to acquire an equity of redemption without becoming liable upon the existing mortgage indebtedness secured upon the plant. Both statutes are permissive in form: the one permits a purchase by one method of procedure, the later permits one of the same acts to be done by another, and neither contains any prohibition, in terms, against the procedure authorized by the other; hence, strictly speaking, there is no necessary conflict in the two enactments thus permitting alternative methods of accomplishing the same result unless, indeed, legislative intention be apparent that the later and more specific statute shall exclusively control the situation it describes. The position seems to us closely analogous to that stated with reference to ch. 348, Laws of 1899, in *Appleton W. W. Co. v. Appleton,* 116 Wis. 363, 374, 93 N. W. 262, 266, and we think it was the plain intent of the legislature that this particular act authorized in 1897 might be done upon compliance with only such regulations and restrictions as were prescribed in that statute. In this view we cannot escape the conclusion

that the provision that the making of the contract of purchase and the issue of bonds must be submitted to popular vote only in case it is necessary to issue bonds in making such purchase clearly excludes any legislative intention that such submission is to be necessary in the absence of any bond issue. Nor can we doubt that the act of 1897, when incorporated in the Revision as sec. 959—51, continued unchanged in meaning. As a result, we must disagree with the trial court, and hold that the contract is not void for want of such popular vote if it was a mere purchase of the equity of redemption in the company's plant and property as authorized by sec. 959—51.

2. The next question in order, therefore, is whether the transaction here criticised was such a purchase. The respondents vehemently contend that it was a purchase of the capital stock of the corporation, authorized only by sec. 927—1, and controlled, therefore, by the condition in that section for submission to popular vote. Of course, the fact that the city did receive, in form, transfer of all the stock of the corporation lends color to this contention, but the act of the city, being governmental, is entitled to at least a *prima facie* presumption that its officers were intending to act legally and within their powers. It must also be assumed, as has so often been said with reference to statutes regulating town and county procedure, that mere matter of form or irregularity need not obscure or defeat a good-faith attempt to do something which is authorized and which these public officers, in the exercise of the duty delegated to them, deemed to be for the welfare of the community. It is true that the preliminary negotiations were with *Mr. Upham,* who seems to have controlled, though perhaps not owned, all of the stock, and contemplated purchase of his interest; but preliminary negotiations are in no wise conclusive as to the terms of a contract; indeed, they are not admissible, unless there be such ambiguity in the contract as to necessitate the consideration of the circumstances surrounding it in order to ascertain the intention of the parties.

The recommendation of the committee, upon which the final action by the council was taken, was for the purchase of the property subject to the incumbrances thereon; in other words, the equity of redemption. This would seem to indicate a departure from the conception which the parties had in the earlier negotiations, due, perhaps, to the fact that the city had obtained advice of counsel that they had no power to acquire the control of the corporation by purchase of stock without a vote of the people, nor, perhaps, without making the bonds of such corporation an additional municipal debt. The final action of the council was a resolution to make a certain written contract then present before it. That contract required, primarily, a transfer of all the property of the corporation by the corporation and for a price to be paid to the corporation. All this is inconsistent, of course, radically, with the transaction mentioned in sec. 927—1 of the city's taking control of the corporation by buying its stock, or, apparently, indeed a mere controlling majority thereof from the stockholders, thus leaving the plant itself still the property of the corporation. The conduct of all the parties was equally inconsistent with that view. The property itself was delivered over and surrendered by those who were the corporate officers and employees to the possession and management of city officers and employees chosen by the city government as such, and not at all through the medium of corporate action as would have been the method under a stock purchase as authorized by sec. 927—1. Other clauses of the contract are also inconsistent with the conception of a continued ownership of the plant by the corporation, such, for example, that until completed payment the city should pay the taxes, and should hold the premises as tenant at sufferance of the corporation; also, that the city should pay the operating expenses incurred by the company subsequent to March 1, 1904, which would be absurd if the corporation were to continue in the control and management, even though such corporation were to be dominated by representatives of

the city as stockholders.    There is in this contract still an-
other element entirely inconsistent with the idea that the city
was to obtain ownership of the corporation by the transfer of
the stock, for in that case the ostensible payment of $25,400
would be merely fictitious.    The agreement is that it should
be paid to the corporation, but what belongs to the corporation
belongs equitably to its stockholders.    Hence, the moment the
city paid into the treasury of the corporation this money, it
would have been under the control of the city as the holder of
all the stock, and, in practical effect, would be payment by the
city to itself.    This, of course, was not the contemplation of
the parties, but, on the contrary, they understood and acted
upon the idea that this money, going to the corporation, for its
property, was subject to distribution among its former stock-
holders, although they had, in form, completely divested them-
selves of their stock by assignment to the city.    Reason enough
can be found for insistence by the city that the evidences of
all the outstanding stock should be delivered over to it, for
there might be serious question whether a board of directors,
or even the stockholders in meeting, could, against the wish of
any one of them, dispose of all the corporate property in such
a way as to put it out of business and disable it from perform-
ing its corporate function and duty.    It is a very reasonable
precaution that any peril of criticism or attack should be fore-
stalled and excluded by requiring the corporation to procure
from all its stockholders a delivery of their stock as an evi-
dence of their assent to the transaction, and as a method of
canceling all the corporate liabilities except the mortgage
bonds, to more perfectly assure the title to the property ac-
quired by the city.

After weighing all these considerations, we cannot avoid
the conviction that the contract in fact made was for purchase
of the equity of redemption in the property of the corpora-
tion, and that the transfer of the corporate stock and unissued
bonds was not a purchase of either to acquire control of the

corporation as contemplated by sec. 927—1, but merely a method of securing their cancellation; hence, that the transaction was such as sec. 959—51 authorizes without submission to popular vote.

The respondents present several other theories upon which it is claimed the judgment should be affirmed even though it be determined that submission to popular vote was not required. Among these are the propositions that by the transaction the city becomes indebted beyond its constitutional limit of five per cent.: First, because the $125,000 outstanding bonds of the water company must be considered indebtedness; and, secondly, that by the purchase the city becomes obligated to the bondholders absolutely for at least $72,000 by reason of a provision in the ordinance contract with the water company that in case the company should at any time issue mortgage bonds the city would pay so much of the hydrant rentals as will discharge the interest upon such bonds as it may mature from time to time, direct to the trustees when and as such rentals are payable by the city, and that such payments shall be made so long as the interest on such bonds shall remain due and unpaid. It seems to be conceded by the appellants that the five per cent. limit would be exceeded if either $125,000 or $72,000 of indebtedness is incurred by this contract.

3. The contention that, by purchasing this plant subject to the mortgage thereon securing payment of the $125,000 of the company's bonds, the ultimate payment of them by the city has become so unavoidable that for all practical purposes it is bound to pay them and must be held indebted for their amount, so as to infringe the constitutional prohibition against becoming indebted to an amount more than five per cent. of the assessed value of taxable property, is not without very persuasive authority, if the question can be considered an open one in this court. We do not think it can, however. In the Milwaukee park-land cases (*Perrigo v. Milwaukee,* 92 Wis. 236, 65 N. W. 1025; *Milwaukee v. Milwaukee Co.* 95 Wis. 424,

69 N. W. 819, and *Burnham v. Milwaukee,* 98 Wis. 128, 73 N. W. 1018) this court fully considered whether, when a city purchased property, or acquired the right to purchase it, from the fact that rights in or burdens upon that property were held by others, so that the city, to hold it and protect the interest acquired in it, must pay large sums of money, the city thereby became indebted for such sums in the constitutional sense. We reviewed the conflicting array of decisions, and, rejecting the reasoning of those the respondents now cite, we decided the question in the negative. The distinguishing element, as then defined, consisted in the fact that the city could not be coerced by the creditor of its grantor into applying to his claim either its general revenue or property owned by it at the time of the contract, but was free at its election to abandon the plan of acquiring or holding that which, prior to the contract, it did not own. This distinction between conferring upon another power to take, *in invitum,* either general municipal revenue or property owned by the city prior to the contract, and a right merely to retake the property which is acquired by the contract or the earnings or proceeds thereof, is sustained in many decided cases, of which the following are illustrative: *Kelly v. Minneapolis,* 63 Minn. 125, 131, 65 N. W. 115; *Windsor v. Des Moines,* 110 Iowa, 175, 182, 81 N. W. 476; *Joliet v. Alexander,* 194 Ill. 457, 464, 62 N. E. 861; *Winston v. Spokane,* 12 Wash. 524, 41 Pac. 888; *Faulkner v. Seattle,* 19 Wash. 320, 53 Pac. 365; *State ex rel. Port Townsend v. Clausen* (Wash.) 82 Pac. 187.

We can discover no valid distinction between the park-land cases and the present situation. In both the legislature had, to the extent of its power, authorized the transactions, had declared that the city should be under no legal liability, and that the burden on the property should not be deemed indebtedness within the constitutional limitation. Under no circumstances could the holders of these bonds recover any money judgment against the city for their principal. Nor is any

property formerly owned by the city subjected to seizure by the bondholders. True, by enforcing their right to take away the water and lighting plant they may deprive the city of so much of its money as up to that time has been paid upon the purchase, but the same was true as to the park lands. We cannot, without repudiation of principles now established in our jurisprudence, hold the amount of these bonds to have become indebtedness of the city within the constitutional inhibition.

4. As to the hydrant rentals, respondents concede that this court has adopted the doctrine that a promise to pay for prospective services as they are performed, or instalments of interest for future forbearance of money, does not constitute any indebtedness until each instalment becomes due, and has repudiated the contrary view, in support of which, nevertheless, they cite numerous cases. That such concession is well justified we cannot doubt, nor are we at all inclined to question or re-examine the arguments deliberately approved in *Stedman v. Berlin,* 97 Wis. 505, 73 N. W. 57, and *Oconto City W. S. Co. v. Oconto,* 105 Wis. 76, 80 N. W. 1113. But, argue counsel, though we adhere to those decisions, the situation here is changed by the fact that the city had agreed to pay these hydrant rentals to a third person, to wit, the trustee in the mortgage, and could not by any act of the company be released from such obligation, and that by purchasing the works and thus, by complicity between the company and city, disabling the former from earning such rentals, the city became bound not only to pay such rentals as should be earned, but also, equitably at least, to see to it that enough are earned by the plant to pay the interest on the bonds, which amounts to an absolute promise to pay the money. Counsel for appellants argue with much force that the doctrine of several of the state courts and the federal courts, adopted in *Enos v. Sanger,* 96 Wis. 150, 70 N. W. 1069, and *Tweeddale v. Tweeddale,* 116 Wis. 517, 93 N. W. 440, that a promise by

one upon a good consideration from another to pay money to
a third is, from the moment it is made, irrevocable and impos-
sible of change by the original parties, has no application to
contracts wholly executory on both sides, for there no consid-
eration moves to the promisor until the promisee performs his
part of the contract, and, since it is always in the power of the
promisee, by breaching the contract on his part, to prevent any
obligation ever to arise on the part of the promisor, no right is
conferred on the beneficiary third person until the promisee
does perform and thus supply the consideration essential to
impose a duty on the promisor under the rule of the cases
above referred to.    Also, that there can be no objection to do-
ing by consent of both that which one can do of his own will.
We shall not deem it necessary to decide upon this conten-
tion, for another more directly brings us to the same conclu-
sion as to the effect of the transactions here presented. Clearly
that the hydrant rentals, or part of them, were to be paid to a
third person did not render inapplicable the reasoning of the
Berlin and Oconto Cases.    The rentals were to be paid only
as the service should be rendered.    The consideration for each
instalment was the performance of the service, not the com-
pany's promise to perform it, and the city did not become in-
debted in the constitutional sense until such performance.
So by the original ordinance-contract, and until the purchase
of the works, the prospective obligation for hydrant rentals
was not indebtedness.    No argument advanced, or which oc-
curs to us, serves to show any new obligation assumed by that
purchase.    Nowhere in the contract is there any agreement
by the city to pay interest or to so operate the plant as to earn
hydrant rentals, any more than there is an agreement to pay
the principal of the bonds.    True, the property is subject to
the right of the bondholders to collect from it their interest,
but only to the same extent as their principal; but it is just
this kind of a burden which the statute permits to exist with-
out constituting any general liability of the city capable of be-

ing enforced by the creditors of the company against either the general property or the general revenues; hence not indebtedness such as the constitution prohibits in excess of five per cent.

5. A further ground on which it is contended the judgment should be sustained is because the contract is so unreasonable and improvident that it must be held void. With reference to this subject the court found that the value of the plant, franchises, existing contracts, lands with water rights, going value, and all rights possessed by the company was $100,000; but that, taking into consideration the value of the plant, the amount the city was paying for light and water, and the necessity for better fire protection as well as the demand for better service in both electric light and water supply, and all other circumstances then existing, the purchase of the plant was not an unreasonable exercise of power. It also found that there was no fraud, misrepresentation, or corrupt acts or practices or improper influences in any wise entering into or inducing the transaction. Numerous witnesses were examined varying widely in their opinions as to specific values and as to practical business values resulting from the existence of an established business situation and relations with patrons. The questions of policy which the council had before it were also presented, relating to the prospective growth of the city, the effect thereon of water and light supply, the obstacles to and expense of providing therefor under the existing contract, the difficulties, legal, financial, and businesswise, in the way of any method of making provision for needs of the community otherwise than by contractual adjustment with the company, the experimental character of any other scheme of water or light supply and great uncertainty as to pecuniary results, and the legal complications to be anticipated with resulting certain expense and probable confusion of public affairs and possible irreparable injuries to municipal prosperity. All these considerations seem to have been weighed with great care by the

trial court, and we do not find any reason to conclude that the evidence is clearly or at all preponderant against the finding that the terms of purchase were not so unreasonable as to transcend that very broad discretion over questions of policy which is vested in municipal governments, and which, under all ordinary circumstances, will better promote the local welfare than opinions of courts formed under the serious limitations upon their means of ascertaining and appreciating all the elements involved. *Oconto City W. S. Co. v. Oconto,* 105 Wis. 76, 89, 80 N. W. 1113; *Linden L. Co. v. Milwaukee E. R. & L. Co.* 107 Wis. 493, 506, 83 N. W. 851; *Stafford v. Chippewa Valley & E. R. Co.* 110 Wis. 331, 351, 85 N. W. 1036; *Hurley W. Co. v. Vaughn,* 115 Wis. 470, 476, 91 N. W. 971; *Schneider v. Menasha,* 118 Wis. 298, 306, 95 N. W. 94; *Le Feber v. West Allis,* 119 Wis. 608, 613, 97 N. W. 203.

6. Complaint is made of the fact that, after the contract between the company and the city, the former made a warranty deed to one Reese of all its plant, franchises, etc., subject to the purchaser's rights under the land contract. This is claimed to be void as against public policy, because it disables the corporation from its corporate duty to serve the public. If this were conceded, we perceive no relevancy to the already completed contract with the city. That, if valid when made, could not be invalidated by subsequent dealings between the grantor and third persons. Apart from this, however, it cannot be doubted that the legislation which authorized a city to purchase a water or lighting plant in order to perform for itself and its citizens the services agreed to be performed by means of such plant by its former owner authorized as well such former owner to sell and so disable itself from such services. That act was accomplished before the deed to Reese. The company had already become relieved, because disabled, from performing the duty imposed upon it by the original franchise contract. No public policy could be affected by a

transfer of its mere legal title, which it held solely as security for the purchase price.

We reach the conclusion that the contract assailed in this action was within the authority of the defendant city, acting by its common council, and that plaintiffs are not entitled to any relief preventive of full performance.

*By the Court.*—Judgment reversed, and cause remanded with directions to enter judgment dismissing the complaint.

CASSODAY, C. J., took no part.