State ex rel. Morgan v. Portage, 174 Wis. 588.

STATE EX REL. MORGAN, Attorney General, Plaintiff, vs. City of Portage and others, Defendants.

*June 2—July 13, 1921.*

Public utilities: Improvements of municipal waterworks: Payment: Constitutional limitation of municipal debt: Application: Purchase of utility.

1. While sec. 927—16, Stats., authorizes cities to acquire and construct public utilities and to issue bonds payable only from the revenue thereof and secured by statutory mortgage liens thereon, bonds so issued and secured do not create a corporate indebtedness within the constitutional limitation (sec. 3, art. XI); and a city cannot be coerced into complying with an order of the railroad commission to make improvements in its waterworks system pursuant to like provisions of such act relative to extensions, additions, and improvements, if it would thereby exceed its constitutional indebtedness, the effect of such compliance being to mortgage the city's waterworks to secure the payment of a corporate debt incurred after the works were acquired by the city.

2. Although sec. 927—19b, Stats., authorized a city to execute a mortgage upon an entire public utility or a part thereof, and that "no municipal liability shall be created thereby," the city may not mortgage its property to secure the payment of a liability not in the nature of a purchase-money lien, if to do so would result in creating a corporate indebtedness in excess of the constitutional limitation—though such limitation has no application where the expenditure is incurred to perform a municipal function due to an overwhelming public necessity,— as the expenditure directed by the railroad commission in this case does not pertain to a governmental function but to a business voluntarily conducted by the city in its proprietary capacity.

ESCHWEILER, J., dissents in part.

ACTION of *mandamus* commenced in this court by leave granted. The issues are presented to the court upon the petition, the alternative writ, and a motion to quash the alternative writ.

The action was brought to compel the city of *Portage* to comply with an order of the railroad commission directing

the making of improvements in its waterworks system. The railroad commission issued to the city a certificate permitting it to issue mortgage certificates to pay for the improvements under the provisions of sec. 927—19b, Stats. It is conceded that the city was at the time of the making of the order, and has been at all times since, indebted to substantially its full constitutional limitation. Petitioner alleges that the city can comply with the order by availing itself of either sec. 927—16 or 927—19b as a means of raising money. The city refused to issue any certificates either under sec. 927—19b or 927—16, claiming that do so would be in violation of the constitutional prohibition of sec. 3, art. XI, of the state constitution.

For the plaintiff there was a brief by the *Attorney General* and *Ralph M. Hoyt,* deputy attorney general, and oral argument by *Mr. Hoyt.*

*Harlan B. Rogers* of Portage, for the defendants.

There was also a memorandum brief signed by *John C. Thomson* of New York City, *T. L. McIntosh,* corporation counsel of the city of Superior, and *R. M. Rieser,* assistant corporation counsel, as *amici curiæ,* and oral argument by *J. E. McMillan* of Milwaukee and *Mr. Rieser.*

SIEBECKER, C. J. It is undisputed that if the mortgage certificate the railroad commission authorized the city of *Portage* to issue for the purpose of securing funds for the improvement of its waterworks as directed by the commission is added to the city's existing indebtedness, then the city's indebtedness will exceed the five per cent. limitation prescribed by sec. 3, art. XI, of the constitution.

It is the contention of the state that the city can comply with the order of the railroad commission in making the directed improvement of its waterworks by availing itself of the provisions of sec. 927—16 or 927—19b, Stats., as a means of raising the necessary funds. This claim of the

state is based on the ground that any funds raised by the city to make the contemplated waterworks improvements do not constitute an indebtedness of the city within the sense of the constitutional limitation under the provisions of these statutes.   The question is therefore presented: Do the schemes prescribed by these statutes provide a means by which municipalities may "purchase, acquire, or construct any public utilities, . . . to provide for the payment thereof, and to provide for any extensions, additions and improvements that are necessary" without thereby incurring a municipal indebtedness in the sense of the constitutional limitations forbidding municipalities to become indebted in any manner or for any purpose to any amount exceeding five per cent. of the assessed valuation of the taxable property therein?   An examination of sec. 927—16 discloses a legislative attempt to accomplish these purposes.

Sub. 1 declares that whenever the voters have determined by vote to purchase, acquire, or construct a public utility the governing authority "shall have power . . . to provide for the payment thereof, and to provide for any extensions, additions and improvements that are necessary," in the manner provided; namely, by setting aside the income and revenue of such utility as a separate and special fund, which is to be applied to pay the expense of its maintenance and operation and the payment of the purchase or construction price.   This revenue is divided into fixed proportions for (a) maintenance and operation, (b) an adequate depreciation account, and (c) the payment of the principal and interest of the bonds authorized by this statute.   Sub. 3, 4, 5, 6, and 7 specify in detail how these three proportions of the revenue shall be made up and expended.   Sub. 8 provides for the issuance of bonds to secure means for the payment of the utility and "for any extensions, additions and improvements thereof, . . . which bonds shall be payable only out of the said special redemption fund."   The obligations of such

bonds for payment of the principal and interest "shall be a valid claim of the holders thereof only against the said special redemption fund and the fixed proportion or amount of the revenues pledged to such fund, and shall not constitute an indebtedness of such city, village or town within the meaning of the constitutional provisions and limitations." Sub. 9 relates to the cost and value of services rendered by the utility to the municipality and the payment thereof as a current expense, and the costs of such services for the municipality must, under sub. 10, be just and reasonable. By sub. 11 all the moneys realized on a sale of bonds "shall be applied solely for purchasing, acquiring or constructing such public utility, and in the payment of the cost of any necessary extensions, additions and improvements," and "there shall be and there is hereby granted and created a statutory mortgage lien upon the public utility so purchased, constructed or acquired to and in favor of the holders of the said bonds . . . and the coupons of said bonds." It is provided that in case of default in payment of the bonds this lien may be enforced by action, and in case of the sale of the utility to satisfy such lien the purchaser shall be vested with an indeterminate permit to operate the utility. The result of these provisions is to provide for the payment of the purchase price of a utility when acquired or constructed, including necessary improvements, additions, and extensions, out of the earnings of the utility. In substance the statute provides for the creation of a purchase-money lien on the utility and the application of the revenue it produces for the payment of the expense of its operation, depreciation, and the cost of acquisition or construction. The effect of the scheme is to subject the utility to a purchase-money mortgage lien, which the city does not assume to pay by resorting to its taxing power or to its property or funds. The city assumes no financial obligation, but contracts to perform the duty of managing the revenues of the utility for the bene-

592·   SUPREME COURT OF WISCONSIN.   [July

State ex rel. Morgan v. Portage, 174 Wis. 588.

fit of the purchase-money lienors, and if the utility pays for itself in the manner provided by the statute then the municipality is to become the owner of the utility.   In speaking of the significance of the word "debt" as used in sec. 3, art. XI, of the constitution, this court said in *Burnham v. Milwaukee,* 98 Wis. 128, 73 N. W. 1018:

"It means 'something owed;' 'money due or to become due upon express or implied agreement.' . . . It denotes not only an obligation of the debtor to pay, but the right of the creditor to receive and enforce payment.   (Citing.) Under the constitution as well as under the law of taxation the question is: Is the city indebted?"

The court held in that case that contracts for the purchase of park land under statutes authorizing such purchases, upon terms "creating a lien thereon for such purchase money, without creating any corporate liability therefor, do not constitute a city indebtedness within the constitutional limitation restricting city indebtedness."   In *Connor v. Marshfield,* 128 Wis. 280, 107 N. W. 639, the court reexamined the holdings in *Perrigo v. Milwaukee,* 92 Wis. 236, 65 N. W. 1025; *Milwaukee v. Milwaukee Co.* 95 Wis. 424, 69 N. W. 819, and the *Burnham Case,* and reconsidered the question "whether, when a city purchased property or acquired the right to purchase it, from the fact that rights in or burdens upon that property were held by others, so that the city, to hold it and protect the interest acquired in it, must pay large sums of money, the city thereby became indebted for such sums in the constitutional sense," and there stated that this court in the *Burnham Case* ". . . reviewed the conflicting array of decisions, and, rejecting the reasoning of those the respondents now cite, we decided the question in the negative.   The distinguishing element, as then defined, consisted in the fact that the city could not be coerced by the creditor of its grantor into applying to his claim either its general revenue or property owned by it at

the time of the contract, but was free at its election to abandon the plan of acquiring or holding that which, prior to the contract, it did not own." We can perceive no ground upon which to distinguish the scheme and plan embodied in sec. 927—16, Stats., for the acquisition of utilities by cities from the principle involved in these adjudications respecting the creation of corporate indebtedness. The plan embodied in this statute is declared by the legislature not to create a municipal debt, and the municipalities are not committed to any expenditure of their funds or property except to pay for current services rendered by the utility to the municipality at reasonable prices out of current revenue. To the latter there can be no legal objection. We are persuaded that the effect of the provisions of sec. 927—16, Stats., in so far as it authorizes the acquisition and construction of public utilities by cities, towns, and villages and grants them power to provide for the issuance of bonds to be paid out of the income and revenue of such utility in the manner prescribed therein, is not to create a corporate indebtedness of any such city, town, or village within the meaning of the provisions of sec. 3, art. XI, of the constitution.

The point is urged that this scheme and plan of paying the cost of purchase or construction of any such utility in the manner prescribed out of the income and revenues cannot be legally applied to the cost incurred for improvements, extensions, or additions to a utility after the utility has been purchased or constructed, for the reason that the provision made for the issuance of bonds to cover the cost of such improvements, additions, and extensions necessarily pledges the property of the utility after it has been paid for in the manner prescribed and has become the property of the city under the provisions of this statute. We think there is merit in this claim. It is manifest that after the utility property has been mortgaged to secure the purchase-money lien created in the manner provided by this statute, it cannot

again be subjected to a new mortgage lien for subsequent improvements, additions, and extensions, if such an indebtedness is in excess of the constitutional limitation, because such a mortgage of the utility property necessarily presupposes the creation of a corporate liability of the municipality for whose payment such security is given other than a purchase-money lien, and would amount to mortgaging property of the municipality to secure the payment of a corporate liability in the form of a debt which did not rest on such property as a lien in the nature of a purchase-money mortgage. It is to be observed that the improvements, additions, and extensions now referred to include such as are attempted to be made after the utility has been acquired by the municipality. It does not follow from this, however, that a city, town, or village may not, at the time of acquiring an existing utility, undertake to improve it, or make additions or extensions thereto for the purpose of providing an efficient utility by putting it in proper condition to render adequate service to the public, and treat the cost thereof as a part of the consideration of acquiring and constructing the utility and provide for the payment of such cost out of the revenue derived from its operation in the manner prescribed by sec. 927—16. It is considered that the part of sub. 11 of this statute which attempts to confer authority on cities, towns, and villages to provide for the payment of the cost of extensions, additions, or improvements of a utility after it has been acquired by additional bond issues in the manner provided in the act would be in violation of the constitutional limitation regulating municipal indebtedness if the cost of such improvements, in addition to the corporate indebtedness, should be in excess of the constitutional limitation.

Upon these considerations it follows that the city of *Portage* cannot be coerced into complying with the order of the railroad commission under the provisions of sec. 927—

16, for the reason that a compliance with the commission's order would result in mortgaging the city's existing waterworks to secure the payment of a corporate debt incurred after the works were acquired by the city. It is admitted that if the city adds the costs of the ordered improvements to the waterworks to its present indebtedness it will exceed the constitutional limitation of its indebtedness. As above indicated, if the city should attempt to make the improvement and pay for the same in the manner provided by sec. 927—16 it would necessarily result in creating a corporate debt and thus violate the prescribed limitations of its indebtedness.

It is urged by the state that if the city cannot proceed to make the improvement of its waterworks as ordered by the railroad commission, then the provisions of sec. 927—19$b$ furnish an exact means to enable the city to raise the money to pay the costs of the improvements without incurring a debt within the meaning of the constitutional provision limiting municipal indebtedness. The statute need not be repeated here. It suffices to call attention to its provisions and to say that if the method prescribed by the legislature authorizing the city to execute a mortgage or trust deed upon the entire plant or a part thereof; that such "mortgage certificates" shall be secured by such mortgage or trust deed; and that "no municipal liability shall be created thereby," it constitutes a scheme which is subject to the same infirmity as the one providing, under sec. 927—16, for additions and extensions to existing utilities. To carry out this scheme results in mortgaging the city's property to secure the payment of a liability which was not a lien on the city's property in the nature of a purchase-money mortgage, and constitutes in fact an application of the property to the payment of a corporate debt. It must therefore be held that the city of *Portage* cannot make the improvements ordered by the railroad commission under the provisions of secs.

927—16 and 927—19b, because it would result in creating a corporate indebtedness in excess of the constitutional limitation.

But it is urged that the city of *Portage* can be coerced to comply with the commission's order under the scheme of sec. 927—19b upon the ground that the constitutional limitation of municipal indebtedness has no application to an indebtedness of a municipality in cases where the expenditure is incurred to perform a municipal function due to an overwhelming public necessity. It must be borne in mind that the expenditure ordered and here in question does not pertain to a governmental function, but to a business the city is conducting in its proprietary capacity in which the city engages voluntarily. True, in the conduct of such business it can do nothing to the detriment of the public health, good order, and the general welfare. If it transgresses its legal duties in these respects it can be coerced to obey the law. It does not follow, however, that a city, in order to remedy an evil like the one the commission found exists in the city of *Portage,* can create an indebtedness in excess of the constitutional limitation. If a city can do this it would afford an easy way to create large corporate indebtedness in cases like the instant one through extensions and enlargements of a public utility of a city. We think that the municipal debt created by assuming to pay the expense of improving a city's water plant in order to furnish its inhabitants with a reasonably adequate supply of wholesome water, as the city of *Portage* was directed to do by the railroad commission by the issuance of mortgage certificates as prescribed by sec. 927—19b, would create a debt within the constitutional provisions and cannot lawfully be incurred if it exceeds the prescribed five per cent. limit.

Upon the foregoing considerations it follows that the city of *Portage* cannot be coerced by *mandamus* to carry out the order of the railroad commission.

*By the Court.*—The petition of the relator must be dismissed, and the alternative writ of *mandamus* is quashed.

The following opinion was filed October 3, 1921:

ESCHWEILER, J. (*dissenting in part*). With so much of the decision as dismisses the relator's petition and quashes the alternative writ of *mandamus* I concur. That portion of the decision disposes of all that is squarely presented in this case. So much of the decision as suggests methods that may be pursued under either of the statutory proceedings discussed in the decision is upon questions not before us and is not necessary for the determination of this case. For that reason I shall content myself with saying that in my judgment such suggestions are an advance judicial approval of methods of avoiding the clear intent and express language of a constitutional provision, the recent amendment to which indicates the disapproval of the people of this state to there being piled up, either directly or indirectly, additional municipal burdens or obligations when the established limitation has been reached.