Loomis, Plaintiff, vs. Callahan and others (constituting the Annuity Board of the State Retirement System), Defendants.

*May 15—May 29, 1928.*

The cause was submitted for the plaintiff on the brief of *William F. Hannan,* attorney, and *Hannan, Johnson & Goldschmidt,* of counsel, all of Milwaukee, and for the defendants on the brief of the *Attorney General, Franklin E. Bump,* assistant attorney general, and *H. A. Minahan,* deputy attorney general.

OWEN, J. The decision in this case sustaining the demurrer and dismissing the action was announced on the 29th of May, 1928. It will be the function of this opinion to state the reasons for the judgment ordered.

Sec. 36.06 (6) of the Statutes authorizes and empowers the regents of the University to lease University lands to a nonprofit-sharing corporation or corporations, upon condition that such corporation or corporations shall construct on such leased land such buildings, improvements, or equipment for dormitories, commons, field house, or addition to the Memorial Union Building as the regents shall designate or

approve, and shall lease the same to the regents upon satis-factory terms as to the current rental, maintenance, and ulti-mate purchase by the regents. The purpose is declared to be the providing of dormitories and commons and a field house to be used for University purposes, and to enable the con-struction, maintenance, and ultimate acquisition thereof by the regents. Similar power is conferred upon the regents for the purpose of completing, equipping, and furnishing the Memorial Union Building.

The act further provides that "revenues derived from the operation by the regents of such dormitories, commons, Memorial Union, or field house shall be applied to the pay-ment of such rentals, any surplus which from time to time may accrue to be applied toward the purchase price of the building, equipment, or improvements, or accumulated for subsequent application upon the purchase price." The re-gents are authorized and empowered to enter into such leases and contracts with such corporation or corporations for the above purposes as they shall deem for the best interests of the University: "provided, that nothing herein contained shall authorize the regents to incur any state debt for the construction of such buildings, equipment or improvements." The leasehold interest in and the buildings erected on such lands are exempt from taxation.

The Wisconsin University Building Corporation is or-ganized for the declared purpose of buying, selling, leasing, and otherwise acquiring and conveying real estate, and to construct, equip, and furnish buildings or other permanent improvements thereon for the exclusive uses, purposes, and benefit of the University of Wisconsin, and, generally, to carry out the purposes of sub. (6) and (7) of sec. 36.06, Stats. "The corporation shall be non-stock and no dividends or pecuniary profits shall be declared to the members there-of." Art. 3 of Articles of Organization. "The persons who now or may hereafter hold the positions of or perform the

duties of the present secretary of the board of regents, business manager, and comptroller of the University of Wisconsin shall be the members; they and each of them shall be discharged from such membership on ceasing to hold such position or to perform such duties, and their and each of their successors shall thereupon become members." Art. 8 of Articles of Organization.

On August 31, 1927, the regents leased to said corporation certain University lands, upon which there was in construction what is commonly known as the Memorial Union Building, for the term of fifty years, for the rent of one dollar for the full term of said lease, and on the same day the building corporation leased to the board of regents the same property for an indefinite period at an annual rental of $37,245.52, it being provided therein that "whenever any bonds, notes, or other obligations that may be issued by said party of the first part secured by a mortgage or pledge of the above mentioned Memorial Union Building and Tripp Commons, or other improvements shall have been satisfied except for any such bonds, notes or other obligations that are owned by the party of the second part, said party of the second part may at its option take title to said Memorial Union Building and Tripp Commons or improvements by surrendering said bonds, notes, or other obligations."

On the 27th day of August, 1927, the board of regents adopted a resolution purporting to authorize the Wisconsin University Building Corporation to contract for decoration, furniture, fixtures, and equipment for the Memorial Union Building and Tripp Commons in an amount not to exceed $400,000. The board also by resolution provided for the collection of a fee from each student to be known as a Memorial Union fee, "to be used for the operation and maintenance of University buildings devoted to men's and women's all-University social activities,—chiefly the Memorial Union."

In March, 1928, the regents leased to said building corporation certain University lands on the University campus for a term of fifty years, for the consideration of one dollar, upon condition that the building corporation erect a field house thereon and equip the same for use by the regents of the University. The building corporation then leased to the regents of the University the field house proposed to be constructed upon terms similar to those contained in the lease of the Memorial Union Building.

Pursuant to application made by the building corporation the defendants, constituting the Annuity Board of the State Retirement System, have resolved to loan to the building corporation the sum of $400,000 at four and one half per cent., amortized over a period of fifteen years, upon the leasehold security which the building corporation has in the Memorial Union Building, and likewise said Annuity Board has resolved to extend to the building corporation a loan of $326,000 at four and one half per cent, on a thirty-years amortized plan, upon the leasehold interest of the building corporation in the field house.

This action is brought to restrain the Annuity Board from completing said loans, by the plaintiff, who is a real-estate owner, taxpayer, and teacher in the public schools of the state, and who is and has been for some time past a contributing member of the State Retirement System.

The original plan outlined by the statute and followed by the board of regents to make available for use by the University certain buildings and equipment necessary for the prosecution of University functions may be briefly summarized as follows: The University owns certain lands comprising what is popularly termed the University campus. These lands have been acquired by the University with a view of constructing thereon necessary University buildings and otherwise devoting them to University purposes. The

growth of that institution continuously reveals increasing necessities calling for construction of additional buildings and the expenditure of moneys which the legislature is reluctant to appropriate because of the attendant increasing tax burdens. In this situation the legislature has applied to public necessities some of the financial genius which we find continually displayed in private business, with the thought of financing necessary undertakings by the pledging of future earnings arising from the operation of such enterprises. Accordingly the legislature has authorized the board of regents of the University to lease certain portions of its campus to a private corporation upon condition that such private corporation will erect upon such leased land desired buildings and lease such buildings when so erected to the regents, who will operate and manage the buildings and, eventually, pay for the same out of the profits derived from such operation. Numerous constitutional objections have been raised to this plan, some of which are serious and some trivial. Those deemed worthy of consideration will be treated.

At the outset it is claimed that the leasing of campus lands to the building corporation is invalid because it gives state property to a private corporation for private purposes without compensation. This contention is based upon a very narrow conception of the transaction and overlooks the general situation and the compensating benefits accruing to the University by virtue of the transaction. The University owns the lands and needs the buildings. The money with which to construct the buildings is not available, but by leasing the land to a third party such third party will finance the erection of the building and make it available for the University upon terms which will enable the University in time to pay for the building out of the earnings accruing from its operation and management. This certainly furnishes a consideration which supports the lease and renders the transac-

tion immune from the charge that public property is being given to private persons for private use without compensation.

These considerations also demonstrate that by this transaction the credit of the state is not being loaned in aid of any individual, association, or corporation, as is also contended on the part of the plaintiff.

It is further contended that the transaction results in an indebtedness on the part of the state. This is perhaps the most serious contention made. The North Dakota court in *Wilder v. Murphy* (N. Dak.) 218 N. W. 156, held that a similar transaction created a state indebtedness, while it was held in *McClain v. Regents,* 124 Oreg. 629, 265 Pac. 412, that no state indebtedness was incurred. While the law specifically provides that the regents shall not incur any state indebtedness under this scheme of financing, this legislative declaration would be futile if that which the regents are authorized to do does in law result in a state indebtedness. However, we start with the proposition that it was not intended by the law that any state indebtedness should be incurred. We must look to the substance of this transaction to ascertain whether that which the regents are authorized to do gives rise to a state indebtedness.

It is of no legal consequence to say that the plan is a subterfuge and devised for the mere purpose of circumventing the constitution. That may be admitted without answering the question thus presented one way or the other. In order to condemn the transaction it must be found that it creates a state debt within the meaning of the constitution. Even though any plan which places needed buildings at the disposal of the state may be said to circumvent the constitution, it does not offend against the constitution unless the plan does give rise to a state debt within the meaning of the constitution. Under this plan the only obligation entered into by any one representing the state, or with power to bind the state, is the obligation to pay the designated rent stipulated

by the terms of the lease running from the building corpora-
tion to the board of regents. But for this purpose only the
proceeds arising from the operation of the leased property
are to be applied upon the payment of the rent. It is not
contended that the state can be coerced into applying to the
payment of its rent either its general revenues or property
owned by it at the time of the lease by the building corpora-
tion. The regents are "free at their election to abandon the
plan of acquiring or holding that which, prior to the contract,
they did not own." *Connor v. Marshfield,* 128 Wis. 280,
107 N. W. 639. That a city may contract for the purchase
of property and pledge the proceeds arising from the opera-
tion of the property so purchased without creating a city
indebtedness, and that such a transaction does not create a
general city indebtedness, is thoroughly settled by the deci-
sions of this court. *Connor v. Marshfield, supra; State ex
rel. Morgan v. Portage,* 174 Wis. 588, 184 N. W. 376.
That there is a conflict of judicial authority upon this ques-
tion accounts for opposite conclusions arrived at by the state
of North Dakota and the state of Oregon in the decisions
heretofore referred to. It appears plain that the transaction
we are considering falls squarely within the doctrine of the
prior decisions of this court. The board of regents ac-
quired an interest in property which it did not have. In pur-
chasing that property it does not pledge the general credit of
the state. It pledges to the payment for the property moneys
arising from the operation of the property thus acquired.
Such a transaction does not constitute a city indebtedness; no
more does it constitute a state indebtedness. We conclude
without difficulty that the transaction does not offend against
the provision of the constitution prohibiting a state indebted-
ness of more than one hundred thousand dollars.

That this legislation does not constitute a delegation of
legislative power to the board of regents, another objection
urged to the law, seems so obvious that it is difficult to dis-
cuss it. The question was probably raised because the North

Dakota court held that the law of that state constituted a delegation of legislative power. But that conclusion probably resulted from the holding of the court that the act authorized the board "to expend moneys of the state without any limitation as to the amount thereof other than the elastic provisions of the act." It would seem that the power which this law vests in the board of regents no more constitutes a delegation of legislative power than many other of the manifold duties imposed upon the board of regents. See sec. 36.06, Stats.

This scheme of financing was made available for the purpose of completing and equipping the Memorial Union Building by the provisions of ch. 542 of the Laws of 1927. This is known as the University appropriation act. It is claimed that this act was not properly passed by the legislature because certain votes upon amendments in the Senate were not taken by yeas and nays. It appears that Bill No. 611S, which became ch. 542, Laws of 1927, was introduced by the joint committee on finance. After the adoption of amendments No. 1S and 2S it was passed, the roll call on final passage being 19 yeas and 7 nays. The amendment No. 2S took from the regents an appropriation of $550,000 made by the legislature of 1925, found in sec. 20.41 (1) (n), for an addition to the library, and transferred it to the State Historical Society. Assembly amendment No. 2A, striking out amendment No. 2S, was adopted by that body. The bill was returned to the Senate, where all Assembly amendments were concurred in by a yea and nay vote. However, after such concurrence, the vote by which amendment No. 2A was concurred in was reconsidered, amendment No. 1S to amendment No. 2A was then adopted by a yea and nay vote, and the bill was returned to the Assembly. A disagreement arose between the two houses over amendment No. 1S to amendment No. 2A, resulting in a conference committee on such difference. The conference committee recommended

that the Senate recede from its position on amendment No. 1S to amendment No. 2A. The conference report was adopted and the Senate receded from its position without a roll call. There was a roll call upon all questions arising during the passage of the bill, except upon the question of adopting the report of the conference committee and the receding by the Senate from its position on amendment No. 1S to amendment No. 2A. It is contended that the constitution required a vote by yeas and nays upon this question.

Sec. 8, art. VIII, of the constitution provides that "on the passage in either house of the legislature of any law which . . . continues or renews an appropriation of public or trust money . . . the question shall be taken by yeas and nays, which shall be duly entered on the journal; and three fifths of all the members elected to such house shall in all such cases be required to constitute a quorum therein." In 25 Ruling Case Law, p. 882, it is stated:

"In some jurisdictions it is held that the final passage of a bill, within the requirement that on a final passage the vote must be by yeas and nays entered on the journal, is the passage or vote by which in its final form it becomes a law, and that any amendment to a bill must be voted upon by yeas and nays. But, according to what seems to be the preponderance of authority, the final passage of a bill is the vote by which each house adopts the bill after it has passed its third reading. Where a bill has been passed in one house and amended and passed in the other, the vote on the adoption of the amendment by the house in which the bill originated need not, under such a constitutional provision, be taken by ayes and noes and entered on the journal."

A note upon this question will be found in 16 Anno. Cases, p. 977.

We do not deem it necessary to choose between these rules at this time. With our present thought upon the subject, it does not seem certain that either rule should be inflexibly applied. It does not seem that the purpose of the constitu-

tional provision requires trivial amendments, such as correcting tautology, to be adopted by a yea and nay vote. On the other hand, a bill might pass one house to which an appropriation was added by amendment in the other. Under such circumstances the spirit and purpose of the constitutional provision might require the concurrence in that amendment by the house of origination to be by yeas and nays. In this case the result of the action of the Senate in adopting the report of the house committee and receding from its position was to withdraw from the bill the amendment No. 2S. This amendment did not make an appropriation. It simply transferred an existing appropriation from the board of regents of the University to the State Historical Society. The bill passed in its original form, so far as amendment No. 2S was concerned. The bill as it passed and became a law had the concurrence of a necessary number of both houses indicated by a yea and nay vote. This is true unless it can be said that the amendment No. 2S was an inducement to the rest of the bill. But such plainly is not the case. It was an independent proposition and had little if any relation to the other features of the bill. It would be a strict, harsh, and senseless rule that would condemn the entire act because the Senate consented to the elimination of amendment No. 2S without a yea and nay vote. It would call for a blind adherence to the strict letter of the constitution which killeth rather than an accordance with the spirit which giveth life. *State ex rel. Crucible S. C. Co. v. Wisconsin Tax Comm.* 185 Wis. 525, 201 N. W. 764. A very similar situation was resolved in the same manner in *People ex rel. Scott v. Supervisors of Chenango,* 8 N. Y. 317.

It is further objected that the act purports to authorize the disposition of University lands and the investment of moneys derived therefrom by the regents instead of by the land commissioners, contrary to art. X, secs. 7 and 8, Wisconsin Constitution. The school and university lands men-

tioned in those sections are lands granted by the federal government to the state for University and educational purposes. The lands here involved are not such lands, and are not under the control of the land commissioners. *State ex rel. Owen v. Donald,* 162 Wis. 609, 612, 157 N. W. 794.

It is further claimed that the exemption of these lands from taxation is unconstitutional. This is scarcely worthy of discussion. The title to the land rests in the state and in the building corporation. The buildings are constructed upon property owned by the state. They are built for the use of the state. They are used to carry on the functions of the State University. The state contemplates the ultimate exclusive ownership of the property. To tax this property would react on the state the same as the taxation of any other state property. The same considerations which dictate the exemption of state property from taxation apply with scarcely less force to the property in which the building corporation has a title in the nature of a leasehold interest.

It is further contended that the law is a private and local law, that the subject thereof is not adequately expressed in the title, that it confers corporate powers and privileges by special legislation,—all of which objections have had our consideration, but which we do not consider involved in sufficient doubt to justify an extension of this opinion.

The propriety or sufficiency of the security tendered by the building corporation to the Annuity Board has not been challenged, and we give that matter no consideration.

ESCHWEILER, J. (*dissenting*). However necessary or praiseworthy the ends reached by the decision in this action may be, or however certain repayment may be, I cannot concur in a decision upholding the means and methods used for obtaining such ends.

No one could successfully contend that the board of regents of the University could have gone to these defendants

and obtained directly from them loans of these trust funds to the amounts and for the purposes that are being authorized by this decision. A direct loan by the regents would clearly be in violation of the constitutional limitation upon the state's power to contract debts under the conceded present condition of its outstanding obligations. The failure here to follow the direct, open and above-board method of attempting a direct loan by the regents, they who want this money and they who are to spend it, is an admission that the desired funds cannot be obtained except coupled with the possible taint that may go with indirection or subterfuge.

That the advancing of these large sums aggregating over seven hundred thousand dollars by the defendants, trustees, is a loan by them of those funds is clear. The trustees in so advancing these trust funds are making a loan and they thereby assume the position of a creditor; inevitably the other party to this transaction is a borrower and a forthwith, downright debtor. No words by the legislature or anybody else can other than colorably change that situation. This transaction cannot be read out of the legal definition of the word "debt" as used in the constitution and as defined in *State ex rel. Owen v. Donald,* 160 Wis. 21, at p. 59, 151 N. W. 331. This prior express ruling on such a question is, as I view it, being merely brushed aside and disregarded by the majority opinion here, which, as I read it, views the matter as though there were but one side in this matter—that of the borrower,—and not considering it as a two-party arrangement. The suggestion by the majority that there is no debt because the regents may, at their option, at any time hereafter abandon the several building projects, and that there would be then no ways or means, by legal proceedings, to compel the regents or the state to replace the depletion in the trust funds, would, if correct, place the defendants as custodians of trust funds and making loans with such a contingency, in a position not to be envied. It surely cannot be

treated as a gift, for as trustees they have no power to make gifts. They can make no legitimate advance of such funds, either under any statute or under any heretofore recognized doctrine concerning the duties and powers of trustees, except and unless there be present an express or implied obligation by a responsible, tangible debtor, in good faith, to repay the same. They have neither express nor implied power to advance their funds to a mere shadow of a creditor. The money is in fact being presently advanced for the state of Wisconsin, as represented in this particular transaction by its University, and is to be used by it. Sec. 36.06(6). For money so used there exists a moral obligation, which would and should be fully as binding as any legal obligation could be, upon the state of Wisconsin, to see to it that moneys so taken from such trust funds (for the conservation of which the state itself is bound) are replaced in the trust funds, as though there had been an express promise on the part of the state to so repay. The resort under sec. 36.06 (6) to the purely euphonious phrase, "provided, that nothing herein contained shall authorize the regents to incur any state debt for the construction of such buildings, equipment or improvements," is rather more of a confession of the weakness of than a strengthening bulwark to this scheme to enable public officials to do by indirect that which they could not do by direct methods. Even a legislative declaration that in some particular instance two and two are no longer four, but zero, does not alter the inexorable mathematical result obtained by simple addition.

This being so clearly the obtaining of over $700,000 to be used for state purposes by state officials, I think it is prohibited by the language as well as by the spirit of art. VIII of the constitution, so carefully, stringently, and wisely limiting the otherwise uncontrollable legislative and administrative impulses to mortgage the future for the desires of the present. This transaction cannot be upheld as being within

sec. 6 of said article, permitting the incurring of a public debt for the defraying of "extraordinary expenditures," and if, by any elasticity of construction, it could be classed as an "extraordinary expense," then it would still meet the barrier therein contained of the $100,000 limitation, which is concededly now existing. Of course it cannot come under sec. 7 of said article, permitting the borrowing of money for war purposes.

Finally, sec. 10, art. VIII, expressly and emphatically prohibits the state from contracting any debt for works of internal improvement or from being a party in carrying on such works. The use of these funds so being transferred from a trust fund under the control of one set of state officials to be spent by another set of state officials is for a work of internal improvement within the meaning of that provision in the constitution. *State ex rel. Owen v. Donald,* 160 Wis. 21, 76, 151 N. W. 331. Though these two sets of officials, the borrower and the lender, do not appear to be dealing with each other very much at arms' length, nevertheless they carry on all their doings as agents of the state. Not a dollar of this money is to be used except as directed and controlled by the board of regents, and therefore it is the state itself which is thus a party, in truth and in fact, in carrying on such works of internal improvement. Can there be any doubt but that if it were not recognized that the good faith of the state itself is back of the promises to repay this wholesale incursion into trust funds that the defendant trustees never would have ventured to advance these funds? I think that such good faith of the state is relied upon in this transaction, as much so as though it had been so expressly written, and in italics, in the *pro forma* obligations signed by the nondescript, financially irresponsible, corporation created for evasion purposes.

It has always been recognized as the right, if not always as the absolute duty, of a court clothed with the equitable

jurisdiction which is here properly invoked, to apply its X-rays to all masks and covers and see through to the real substance. *Friedman v. Wis. Acceptance Corp.* 192 Wis. 58, 60, 210 N. W. 831; *Cunneen v. Kalscheuer,* 188 Wis. 448, 451, 203 N. W. 737, 206 N. W. 917; *Camp v. Boyd,* 229 U. S. 530, 559, 33 Sup. Ct. 785; 10 Ruling Case Law, 380; 21 Corp. Jur. 204. The feeblest possible of Roentgen rays would disclose that the board of regents and not this corporate shell are the borrowers to whom these funds are being loaned.

By the present decision a way seems now to be pointed out and sanctioned by which solemn constitutional provisions may be disregarded to an unlimited extent, and through the organization of mere dummy corporations (and no express legislative authority for such seems necessary) works of public improvement may be carried on by state officials borrowing trust funds through such shadowy substitutes, from other state officials.

Although it is said in the majority opinion, "the sufficiency of the security tendered by the building corporation to the Annuity Board has not been challenged, and we give that matter no consideration," nevertheless I think, and particularly so as to the field house, the propriety or sufficiency of the security tendered to the defendants should be considered by this court, where, as here, a direct challenge is made to the power and authority of the defendants to make these advances, and that such an important question should not be, as it is, passed over here. If sufficient facts are not now before the court on such question they should be required to be presented before the loans in this case are approved by a formal judgment which will stand as a precedent for future times as to the handling of trust funds, and especially so where there are the strict statutory provisions as to the nature and kind of security proper to be taken for any loans by defendants.