SIGMA TAU GAMMA FRATERNITY HOUSE CORPORATION, Plaintiff-Appellant, v. CITY OF MENOMONIE, Defendant-Respondent.

Supreme Court

*No. 79–440. Argued December 3, 1979.— Decided January 15, 1980.*
(Also reported in 288 N.W.2d 85.)

For the appellant there were briefs by *Hugh R. Braun* and *Godfrey & Trump* of Milwaukee, and oral argument by *Mr. Braun.*

For the respondent there was a brief and oral argument by *Phillip M. Steans,* assistant city attorney.

Brief of the attorney general was filed by *Bronson C. La Follette,* attorney general, and *Charles A. Bleck,* assistant attorney general.

Brief amicus curiae was filed by *Burt Natkins* of Madison, for The League of Wisconsin Municipalities.

BEILFUSS, C.J.   This is an appeal by the plaintiff, Sigma Tau Gamma Fraternity House Corporation, from a judgment dismissing its complaint against the defendant, City of Menomonie, brought under ch. 32, Stats. The complaint challenged the right of the city to condemn its property. The plaintiff contends the condemnation is not authorized by the terms of sec. 66.46, Stats., the Tax Increment Law, and further asserts the Tax Increment Law is unconstitutional on its face and as applied because of lack of uniformity of taxation and the lack of a public purpose as required by the Wisconsin Constitution. It also alleges several substantive and procedural deficiencies which it claims invalidate the condemnation. This court granted a petition to bypass the Court of Appeals because of the statewide importance of the issues raised.

On January 3, 1977, the City of Menomonie approved Tax Incremental District No. 1 to become effective May 1, 1977, pursuant to the provisions of sec. 66.46, Stats. The district consisted of Block 126, and Lots 1, 2 and 6 of Block 119 of the Original Plat of the City of Menomonie, including a portion of Fifth Avenue between Broadway and Second Streets scheduled to be vacated. Under the Tax Increment Law, sec. 66.46, Stats. (Laws of 1975, c. 105), cities are authorized to create within their boundaries tax increment districts to assist them in financing needed public improvement projects in areas 25 percent of which are found to be "a blighted area," in need of "rehabilitation or conservation work" within the meaning of sec. 66.435, or suitable for "industrial sites" within the meaning of sec. 66.52. When such a district is created, a tax incremental base is determined by the Department of Revenue. The tax incremental base of a district is equal to the full aggregate value of the taxable property within the district at the time it is formed.

Sec. 66.46 (5). In the years following the creation of the district, all positive tax increments over and above the tax incremental base, which are due to the increased valuation of the property within the district, are upon receipt by the city treasurer deposited into a special fund to be used to pay for the costs of the project undertaken by the city. This is done until such time as the city completely recovers its costs or until the expiration of twenty years from the date of the creation of the district. Sec. 66.46 (6). The effect of tax incremental financing is to require those municipalities that share the city's tax base, and that benefit from an increase in that tax base, to share in the cost of improvements in the district undertaken by the city.

As a prerequisite to the creation of a tax increment district, the planning commission is to prepare and adopt a proposed project plan which must then be approved by the local legislative body within six months after the Department of Revenue certifies to the city clerk the tax incremental base of the proposed district. Sec. 66.46 (4), Stats. In this case the project plan approved by the Menomonie Planning Commission and city council called for the city's acquisition and sale of the full amount of land within the district to Mr. Donald Williams who was to construct on it a 25,000 square foot supermarket together with accompanying parking facilities and landscaping.

Williams was at that time the owner of a supermarket several blocks away from the district, but was looking for a new location where he could expand. Although the city had made earlier attempts to encourage commercial development in the area, it was not until after Williams had submitted his proposal to the city that the precise boundaries for Tax Incremental District 1 were determined.

Following completion of the project, the tax yield of the property within the district was expected to increase from $3,481 in 1976 to $24,282 per year thereafter be-

cause of the improvements. Project costs and income were estimated as follows:

| Costs | | Income | |
|---|---|---|---|
| Property Acquisition | $278,000 | Sale of Land | $154,000 |
| Appraisal Costs | 2,000 | Sale of Bonds | 220,000 |
| Relocation Costs | 50,000 | | |
| Land Clearance | 40,000 | | |
| Utility Relocation | 4,000 | | |
| | $374,000 | | $374,000 |

The bonds were to be retired with the tax increment income generated by the improvement.

Plaintiff is the owner of Lots 6, 7 and 8 of Block 126 in the northwest corner of Tax Incremental District 1. The Sigma Tau Gamma Fraternity House is situated on Lots 7 and 8. The house itself is in satisfactory condition and presently serves as the residence of the student members of Sigma Tau Gamma Fraternity.

On January 2, 1978, the city adopted a resolution declaring the taking of plaintiff's property necessary "for the purpose of elimination of blighted and slum areas within the City of Menomonie and [to] encourage improvements within such areas pursuant to Section 66.46, Wisconsin Statutes, entitled 'Tax Incremental Law.'" Plaintiff was served with a jurisdictional offer on March 22, 1978, but did not respond. The matter was assigned to the Dunn County Condemnation Commission which, following a hearing, filed its award on June 2, 1978.

Plaintiff commenced this action by complaint filed May 1, 1978, alleging that the property was not blighted and that it was being taken for a private, rather than public, purpose. Plaintiff also stated in its complaint that it objected to the taking of its property and "hereby challenges the authority of the city to take said property." Prior to trial, plaintiff obtained leave to amend its summons and complaint. The amended summons and

complaint named the attorney general as a party to the action and added two more allegations challenging the constitutionality of sec. 66.46, Stats., on its face and as applied.

Although all parties admit service of the amended summons and complaint, it appears that it was never filed with the court and is therefore not contained in the trial court record. It was reproduced, however, in the appendix to the city's brief. As the attorney general did in fact admit service and responded to each of the issues raised by plaintiff in the trial court below, it appears the jurisdictional requirements of sec. 806.04(11), Stats., have been met.

Following a trial, the circuit court concluded that the city was lawfully entitled to condemn plaintiff's property, that it had lawfully proceeded under ch. 32, Stats., and that the Tax Increment Law was constitutionally valid.

Although several additional issues are raised, we decide only the plaintiff's claims that condemnation by eminent domain is not authorized by the Tax Increment Law, that the Tax Increment Law is invalid because the attorney general failed to seek a declaratory judgment as to its validity, and that the Tax Increment Law violates the Wisconsin constitutional requirements of uniformity and public purpose doctrine on its face.

We conclude that Tax Increment Law (sec. 66.46, Stats.) does not authorize the city to acquire property by condemnation, that the failure or refusal of the attorney general to seek a declaratory judgment does not affect the validity of the statute, and the Tax Increment Law is constitutionally valid.

The plaintiff contends that the Tax Increment Law does not itself authorize a city to condemn property, but only provides a method of financing redevelopment projects or public improvements which a city is authorized to undertake under other statutes. Such projects are specifically authorized under the Urban Development

Law, sec. 66.405, Stats.; the Blighted Area Law, sec. 66.43; the Blight Elimination and Slum Clearance Act, sec. 66.431; and the Urban Renewal Act, sec. 66.435. The plaintiff argues that the city failed to proceed under a law which specifically allows condemnation to eliminate blight, and therefore it is without power to condemn its land.

A careful reading of the Tax Increment Law itself and the legislative declaration which accompanied it support plaintiff's position that the law was intended only as a financing vehicle for projects, not as a new and independent authorization for further urban redevelopment projects. The legislative declaration reads as follows:

"(1) The legislature finds that the existing system of allocating aggregate property tax revenues among tax levying municipalities has resulted in significant inequities and disincentives. The cost of public works or improvements within a city or village has been borne entirely by the city, or village, while the expansion of tax base which is stimulated, directly or indirectly, by such improvements, benefits not only the city or village but also all municipalities which share such tax base. This situation is inequitable. Moreover, when the cost to a city or village of a public improvement project exceeds the future benefit to the city, or village resulting therefrom, the city or village may decide not to undertake such project. This situation has resulted in the postponement or cancellation of socially desirable projects.

"(2) The legislature further finds that accomplishment of the vital and beneficial public purposes of sections 66.405 to 66.43, 66.431, 66.435 and 66.52 of the statutes, is being frustrated because of a lack of incentives and financial resources. The purpose of this act is to create a viable procedure by which a city or village, through its own initiative and efforts, may finance projects which will tend to accomplish these laudable objectives."

The summary of the law by the Legislative Reference Bureau states: "The bill permits a city or village to

arrange the financing of certain public improvements, such as urban development and blight elimination, in a manner that will generally permit it to receive the full positive tax increment until it has been compensated for the expenditures it has made which contributed to the previously designated portion of the property tax base." There is nothing in the legislative record that would indicate an intention to provide under sec. 66.46, Stats., a new stream-lined procedure for condemnation to eliminate blight.

The city and the attorney general correctly point out in their respective briefs that sec. 66.46(3), Stats., specifically provides: "In addition to any other powers conferred by law, a city may exercise any powers necessary and convenient to carry out the purposes of this section. . . ." And under sec. 66.22(1), the legislature has specifically delegated to cities the power of eminent domain for "any other public purpose." Sec. 62.22(1) provides in part:

"**Acquiring property; opening or changing streets.** (1) PURPOSES. The governing body of any city may by gift, purchase or condemnation acquire property, real or personal, within or without the city, for parks, recreation, waterworks, sewage or waste disposal, airports or approaches thereto, cemeteries, vehicle parking areas, and for any other public purpose; . . . ."

Thus, the city and attorney general argue, cities operating under the Tax Increment Law clearly retain their power to condemn property to eliminate blight.

The question raised here, however, is not whether cities have the power to eliminate blight by condemnation in tax increment districts, but whether they can exercise that power under the general provisions of sec. 66.46 or sec. 62.22, Stats., instead of the specific statutory authorization set out under the Blighted Area Law or one of the other redevelopment statutes.

"It is a cardinal rule of statutory construction that when a general and a specific statute relate to the same subject matter, the specific statute controls and this is especially true when the specific statute is enacted after the enactment of the general statute." *Martineau v. State Conservation Comm.*, 46 Wis.2d 443, 449, 175 N.W. 2d 206 (1970). Thus, in *Martineau*, although sec. 32.02 (1), Stats., provides for the general use of condemnation by any public board or commission which has the power to acquire and hold property it wishes to condemn, the court held that the State Conservation Commission did not have this power with respect to acquiring state forest lands where it was not granted by the specific statute relating to that subject.

Certainly a city does have the power to eliminate blight by acquiring land by condemnation, but in order to exercise that power it must proceed under the specific statute authorizing condemnation for that purpose. We conclude it did not do so in this instance.

The Tax Increment Law requires only that the city council adopt a resolution containing the finding that at least 25 percent of the property within the district is a "blighted area" or else meets one of the other criteria. Following its adoption of a resolution containing the finding, the city proceeded to acquire, by condemnation or otherwise, all of the land within the district. There is no indication in the statute itself that the legislature intended to permit a city to take all property within the district upon the mere finding that 25 percent of it was blighted.

Under sec. 66.43, Stats., the Blighted Area Law, it appears that the city must find that the whole area is substantially blighted. Sec. 66.43 (5) (b) provides in part:

"(b) For the exercise of the powers granted and for the acquisition and disposition of real property for the redevelopment of a project area, the following steps and plans shall be requisite, namely:

"1. Designation by the planning commission of the boundaries of the project area proposed by it for redevelopment, submission of such boundaries to the local legislative body and *the adoption of a resolution by said local legislative body declaring such area to be a blighted area in need of redevelopment.*" (Emphasis added.)

Moreover, the statutory definition of "Blighted Area" contained in the Blighted Area Law is significantly more stringent:

"66.43 . . . (3) DEFINITIONS. . . .

"(j) 1. 'Blighted area' means any area (including a slum area) in which a majority of the structures are residential (or in which there is a predominance of buildings or improvements, whether residential or nonresidential), and which, by reason of dilapidation, deterioration, age or obsolescence, inadequate provision for ventilation, light, air, sanitation, or open spaces, high density of population and overcrowding, or the existence of conditions which endanger life or property by fire and other causes, or any combination of such factors, is conducive to ill health, transmission of disease, infant mortality, juvenile delinquency and crime, and is detrimental to the public health, safety, morals or welfare."

This is not to say that property may not be taken under the Blighted Area Law unless it is itself blighted, but surely the blight to be eradicated must be more substantial and prevalent in the area than the city found here.

The purpose of the Tax Increment Law was not to supplant the Blighted Area Law or the other redevelopment statutes, but to provide a mechanism for cities to finance projects commenced under those laws. The two

were to be used in conjunction with one another. We hold that the city's failure to proceed under the proper statute to condemn plaintiff's property was improper and therefore the trial court's decision must be reversed.

We do not hold that the city cannot utilize the Tax Increment Law if it eliminates the plaintiff's property from the district or acquires it under the authorization of the other statutes referred to by purchase, gift or condemnation, as the case may be.

The plaintiff contends that the Tax Increment Law is invalid because of the attorney general's failure to bring an original action in order to test its constitutionality as directed by the legislature. We disagree.

Sec. 5 of ch. 105 of the Laws of 1975 reads, in part, as follows:

"SECTION 5. **Tax increments; court test.** Upon enactment of this section, the attorney general shall promptly commence an action seeking a declaratory judgment to determine whether the constitution permits a city or village to finance certain public improvements with the taxes derived from the increase in equalized taxable valuation within a tax incremental district in lieu of the taxes being received by the local governmental entities having authority to levy a tax within the district as provided in section 66.46 of the statutes as created by this act. The attorney general shall petition for leave to commence the action as an original action before the Wisconsin supreme court. If the petition is denied, he shall commence the action in the circuit court for Dane County."

In its brief the attorney general states that no action was brought to test the law because there were no grounds for such an action. Whether the attorney general could have brought an action or not, its failure to do so is certainly not a reason for declaring the law void. The legislative directive does not state that a court test initiated by the attorney general is a condition precedent

to the validity of the statute and no reason appears why this court should construe it otherwise. The fact that the constitutionality of the law has not been previously tested can therefore have no bearing on its validity.

Plaintiff next contends that the city is attempting to acquire its property for other than a public purpose. In its brief, plaintiff asks this court to conclude that the primary goal of the city in condemning its property was not the elimination of blight, but rather "to obtain an increased assessment on the property which will begin to benefit the public only after the tax increment bonds will be amortized."

The city's stated purpose in acquiring plaintiff's property is to eliminate blight in its downtown area. Assuming the area in question is blighted and acquisition of plaintiff's property is reasonably necessary for the elimination of such blight, the city has the lawful authority to condemn the Sigma Tau Gamma Fraternity House under appropriate statutory authorization. This conclusion is supported by this court's decision in *David Jeffrey Co. v. Milwaukee*, 267 Wis. 559, 66 N.W.2d 362 (1954), as well as the decisions of numerous courts in other jurisdictions.

In *David Jeffrey Company*, an Illinois corporation owning property in the City of Milwaukee challenged a slum clearance and redevelopment project commenced by the city under the state's Blighted Area Law, sec. 66.43, Stats. The corporation alleged in part that the acquisition by the exercise of the power of eminent domain of all the land and structures of a specific area for the purpose of redevelopment thereof by private corporations and individuals for their own use and profit was unconstitutional because it served or promoted no public use or purpose. The statute specifically authorized cities to acquire and assemble blighted areas for the purpose of clearing and redeveloping such areas so as to prevent the

spread or recurrence of slum or blight conditions. To accomplish this objective, cities were further authorized to transfer, lease or sell property within such areas to private persons who would then develop the property for their own needs.

After briefly tracing the concept of "public use" under the eminent domain power in this state, the court concluded that the taking authorized under the Blighted Area Law was for a public use.

"That there is public need for the elimination of blighted areas and for the prevention of the recurrence of such conditions in cities of the state, is uncontradicted. It appears plain that the controlling motive for the ridding of blight and the assurance of its nonrepetition is the safeguarding of the public's health, the public's safety, and the public's welfare. When property is acquired for the purposes of eliminating and preventing blighted conditions as provided for by the statute,—that the public will possess, occupy, and enjoy the same, is clear. We have no difficulty in concluding that the condemnation of property for the elimination of blighted areas and the prevention of the recurrence of blight in such places is for public purpose and public use." 267 Wis. at 579–80.

The court also rejected the landowner's claim that the almost immediate transfer of the land upon acquisition to a private entity for private development meant that the taking was for a private rather than a public purpose.

"Counsel for appellant contends that since the city may only occupy the land for a short duration of time after acquiring it, a taking by condemnation cannot be deemed as for public use. That the property may be in public use or ownership for a short duration of time is not consequential. It is the character of the use and not its extent which determines the question of public use." 267 Wis. at 581.

Under the Blighted Area Law, said the court, the purpose of the taking is to eliminate slums and blight. This purpose is accomplished by the acquisition and clearance

of the blighted land. Once the public purpose is accomplished, the city may lawfully return the property to private ownership. "The sale and leasing of the land to private interests is incidental to the accomplishment of the primary purpose." 267 Wis. at 582.

Furthermore, in order to accomplish the legitimate goal of the law, the court stated, the city could also condemn structures that were themselves unoffending, and even land that was standing vacant, if their acquisition was necessary for the elimination of the blight. The court quoted with approval a portion of the trial court's opinion addressing this issue:

" 'Here again it is to be noted that the law is directed against slum and blighted *areas,* not individual structures. It must be presumed that the legislature believed that the evils resulting from blight are inherent not in the particular structures but in the entire blighted area as a whole. Consider also that the acts of acquisition and clearance are two purposes in the elimination of the blight problem; there remains a third and important purpose—redevelopment of the area, so vitally essential to its return to the community duly safeguarded from the danger of blight recurrence. Redevelopment will involve the vacation of streets and alleys, the relocation of streets, the construction of new streets, probably the construction of recreational facilities, more than likely the enlargement of sites for dwelling houses, replatting, restrictions as to future uses of the lands in the area as well as many other changes. The necessity for acquiring vacant parcels and unoffending buildings within a blighted area to effectuate a sound workable plan of redevelopment is obvious.

" 'Conceivably a large amount of vacant land and a large number of unoffending buildings could be included in a blighted area as that term is defined by the act. (Sec. 66.43 (3) (j) 1, Stats.) It must be presumed that the legislature by necessity and duty acted with full knowledge of the problem in defining the requirements of a blighted area. Its findings are entitled to deference and respect. It is not difficult to perceive that the framers of this law recognized the fact that vacant lands and unoffending structures are commingled with the

offending properties. The act of condemnation is frequently harsh; to condemn unoffending property and later lease or sell it for private use is repugnant to the concept of the fundamental right of private property. It is apparent, however, that to single out and except from the provisions of the law vacant land and unoffending structures would render the whole program of blighted-area redevelopment futile and ineffective. The problem requires more than a halfway measure. Neither is it to be presumed that those charged with the administration of the law will act unreasonably or arbitrarily.' "

This area-wide approach to the problem of urban blight was also upheld by the United States Supreme Court. In *Berman v. Parker*, 348 U.S. 26 (1954), that court rejected an almost identical attack upon the District of Columbia Redevelopment Act of 1945. With respect to the plaintiff-landowner's contention that the sweep of the proposed project was too broad and included unblighted, viable property, Mr. Justice DOUGLAS stated for the court:

"The particular uses to be made of the land in the project were determined with regard to the needs of the particular community. The experts concluded that if the community were to be healthy, if it were not to revert again to a blighted or slum area, as though possessed of a congenital disease, the area must be planned as a whole. It was not enough, they believed, to remove existing buildings that were insanitary or unsightly. It was important to redesign the whole area so as to eliminate the conditions that cause slums—the overcrowding of dwellings, the lack of parks, the lack of adequate streets and alleys, the absence of recreational areas, the lack of light and air, the presence of outmoded street patterns. It was believed that the piecemeal approach, the removal of individual structures that were offensive, would be only a palliative." 348 U.S. at 34.[1]

[1] *See also* Nichols, *Law of Eminent Domain*, Vol. 2A, sec. 7.51561[1], p. 2–214 (1976).

From these authorities it follows that if the area in which plaintiff's property is located is blighted, and if the acquisition of plaintiff's property is reasonably necessary for the elimination of that blight, then the city may lawfully condemn plaintiff's property, despite the fact that that property itself has been properly maintained and is presently in satisfactory condition. Moreover, the city council's actual motive for condemning plaintiff's property is irrelevant as long as the required findings are supported by the evidence. *Banach v. Milwaukee,* 31 Wis.2d 320, 327, 143 N.W.2d 13 (1966).

The plaintiff further contends that the Tax Increment Law violates the tax uniformity requirement of Art. VIII, sec. 1 of the Wisconsin Constitution as that requirement has been applied by this court in *State ex rel. La Follette v. Torphy,* 85 Wis.2d 94, 270 N.W.2d 187 (1978); *Buse v. Smith,* 74 Wis.2d 550, 247 N.W.2d 141 (1976); and *Gottlieb v. Milwaukee,* 33 Wis.2d 408, 147 N.W.2d 633 (1967).

Because we have concluded the city could not acquire the plaintiff's property by condemnation under the Tax Increment Law as it has attempted to do here, we need not decide the constitutional issues; however, in our discretion, we have determined to do so. Our discretion is based upon the obvious state-wide concern about the validity of this important legislation.

Art. VIII, sec. 1 of the Wisconsin Constitution provides in part: "The rule of taxation shall be uniform. . . ." In *Knowlton v. Supervisors of Rock County,* 9 Wis. 378[*410], 388[*420–21] (1859), early in our constitutional history, the court described the basic constitutional command of uniformity as follows:

". . . when property is the object of taxation, it should all alike, in proportion to its value, contribute towards

paying the expense of such benefits and protection. These are plain and obvious propositions of equity and justice, sustained as we believe by the very letter and spirit of the constitution. Its mandate, it is true, is very brief, but long enough for all practical purposes; long enough to embrace within it clearly and concisely the doctrine which the framers intended to establish, viz.: that of equality. 'The rule of taxation shall be uniform,' that is to say, the course or mode of proceeding in levying or laying taxes shall be uniform; it shall in all cases be alike. The act of laying a tax on property consists of several distinct steps, such as the assessment or fixing of its value, the establishing of the rate, etc.; and in order to have the rule or course of proceeding uniform, each step taken must be uniform. The valuation must be uniform, the rate must be uniform. Thus uniformity in such a proceeding becomes equality; and there can be no uniform rule which is not at the same time an equal rule, operating alike upon all the taxable property throughout the territorial limits of the state, municipality or local subdivision of the government, within and for which the tax is to be raised."

In *Gottlieb v. Milwaukee,* supra, the court traced the development of the uniformity rule from *Knowlton* and set forth the following six principles as a statement of the present law:

"1. For direct taxation of property, under the uniformity rule there can be but one constitutional class.

"2. All within that class must be taxed on the basis of equality so far as practicable and all property taxed must bear its burden equally on an *ad valorem* basis.

"3. All property not included in that class must be absolutely exempt from property taxation.

"4. Privilege taxes are not direct taxes on property and are not subject to the uniformity rule.

"5. While there can be no classification of property for different rules or rates of property taxation, the legislature can classify as between property that is to be taxed and that which is to be wholly exempt, and the test of such classification is reasonableness.

"6. There can be variations in the mechanics of property assessment or tax imposition so long as the resulting taxation shall be borne with as nearly as practicable equality on an *ad valorem* basis with other taxable property." 33 Wis.2d at 424.

Applying these principles to the case before it, the court in *Gottlieb* held that the Urban Redevelopment Law, under which local governing bodies were permitted to exempt by ordinance real property held by redevelopment corporations from that portion of every local tax that was in excess of the "maximum local tax," was in clear violation of the uniformity clause. The law in effect froze taxes on property owned by redevelopment corporations while other property owners were forced to pay a disproportionately higher share of local property taxes. The underlying purpose of the Urban Redevelopment Law, like that of the Tax Increment Law here, was to encourage redevelopment of slum or blighted areas of cities. Despite this laudable objective, however, the court concluded that the means that were to be used to accomplish it—unequal taxation of property—were constitutionally forbidden.

More recently, in *State ex rel. La Follette v. Torphy, supra,* 85 Wis.2d 94, the court held that the constitutional requirement of uniformity could not be circumvented by a system of tax credits offered to a certain class of property owners for the purpose of offsetting increased property taxes. Under the Improvements Tax Relief Law, owners of specifically described residential property were allowed tax credits for building and garage improvements undertaken by them which resulted in increased property tax assessments. Even though the eligible owners were required to pay their regular property tax and the credit was paid by the state out of the general revenue fund, the court concluded that the law was essentially a tax statute which operated so as to provide a

partial property tax exemption to a specific class of property owners. The court looked to the statute's effect rather than its form and concluded that the legislation could not stand under the uniformity clause:

"The fact that a rebate credit is paid to certain property owners and not to others leads to the indisputable conclusion that taxpayers owning equally valuable property will ultimately be paying disproportionate amounts of real estate taxes. This is not uniformity." 85 Wis.2d at 108.

With respect to the question of uniformity of taxation among individual taxpayers, the Tax Increment Law is clearly distinguishable, both in form and effect, from the tax provisions struck down by the court in *Gottlieb* and in *Torphy*. In both of those cases, the court based its conclusion that the provisions were unconstitutional upon its finding that taxpayers owning equally valuable property were required to pay disproportionate amounts of taxes.

Under tax increment financing, however, there is no such disproportionate impact upon taxpayers within the same territorial boundaries of the unit imposing the tax. All taxpayers within the territorial limits of each local governmental unit—county, school or V.T.E.A. district, etc.—continue to be taxed at a uniform rate based upon valuations uniformly arrived at. No taxpayer or group of taxpayers is being singled out for preferential treatment either in the form of an exemption from taxation or a tax credit. Thus, we conclude, taxation under tax incremental financing is uniform.

A second limitation on the taxing power, however, is that taxes must be levied and expended for a public rather than a private purpose. Although often linked to the uniformity requirement, the public purpose doctrine

is a separate and inherent limitation on the power of taxation. *State ex rel. Wisconsin Development Authority v. Dammann,* 228 Wis. 147, 183, 277 N.W. 278, 280 N.W. 698 (1938). As enunciated by this court, the public purpose doctrine has two aspects:

"1.   The tax must be for a public—not a private—purpose.
"2.   The purpose of the tax must be one which pertains to the public purpose of the district within which the tax is to be levied and raised." *Buse v. Smith,* 74 Wis.2d at 590.

The majority of this court in *Buse v. Smith, supra,* held that negative-aid school district financing, which required wealthier school districts to contribute locally raised funds to a state fund which was then distributed to poorer districts throughout the state, violated the second aspect of this doctrine. "Regardless of the merits of the legislative enactment or the worthiness of the cause," said the court, "we conclude that the state cannot compel one school district to levy and collect a tax for the direct benefit of other school districts, or for the sole benefit of the state." 74 Wis.2d at 579.

Plaintiff argues that under tax incremental financing, just as in negative-aid financing, the second prong of the public purpose doctrine is violated. Tax revenue from property within the tax incremental district, must be surrendered by taxing authorities to the city sponsoring improvement of that area.

In this respect also, however, tax incremental financing can be distinguished. For unlike negative-aid financing, tax revenue taken from the other taxing authorities under tax incremental financing is used to accomplish a public purpose within their territorial limits. As the legislature expressly found, taxing authorities which share the cities' tax base do benefit from the expansion

of that tax base which results from urban redevelopment or other public improvements. Because whatever money generated from the tax increments district is used only to pay for public improvements in that district and because the elimination of blight is a public purpose, both requirements of the public purpose doctrine would seem to be satisfied.

We also note that if the city was unable to undertake such projects in the first place, the other taxing authorities would be completely without the additional revenue which plaintiff now claims they are forced to surrender to the city. The increased tax revenue is due, after all, to the city-sponsored project. In light of this fact it is difficult to see how the other local governmental entities are being forced to relinquish any revenue to which they would otherwise be entitled.

For these reasons and because of the strong presumption of constitutionality to be accorded all legislative enactments, we hold the Tax Increment Law is constitutional.

Because we have determined that the Tax Increment Law authorizes the financing of the statutorily described public improvements but does not authorize the acquisition of private property by condemnation, that part of the trial court judgment which approved the condemnation of the plaintiff's property by condemnation by virtue of the Tax Increment Law and the general condemnation statutes must be reversed. That part of the judgment that held the Tax Increment Law to be constitutionally valid is affirmed.

*By the Court.*—Judgment affirmed in part, reversed in part and remanded for further proceedings not inconsistent with this opinion. No appeal costs to be taxed.