CITY OF HARTFORD, Petitioner,

v.

Dean T. KIRLEY and John C. Spielmann, Respondents.

Supreme Court

*No. 91-1390-OA. Oral argument September 3, 1992.—Decided December 16, 1992.*

(Also reported in 493 N.W.2d 45.)

193

For the petitioner there were briefs by *Thomas Armstrong, Paul R. Schilling, Juliana Ebert* and *Quarles & Brady,* Milwaukee and oral argument by *Mr. Armstrong* and *Mr. Schilling.*

For the respondent there was a brief by *Karen M. Christianson, Phillip J. Eckert* and *O'Meara, Eckert, Pouros & Gonring,* West Bend and oral argument by *Ms. Christianson.*

Amicus Curiae brief was filed by *Henry A. Gempeler, Reed Groethe* and *Foley & Lardner,* Madison for City of Madison and League of Wisconsin Municipalities.

Amicus Curiae brief was filed by *James H. Schneider,* Madison for the League of Wisconsin Municipalities.

SHIRLEY S. ABRAHAMSON, J.   This is an original action, brought pursuant to sec. 809.70, Stats. 1989–90, by the City of Hartford, Wisconsin, against Dean T. Kirley and John C. Spielmann, respectively the mayor and city clerk for the City of Hartford. The City of Hartford (City) seeks a declaratory judgment that the tax incremental bonds (TIF bonds) it plans to issue for Tax Incremental District No. 4 (TID No. 4) pursuant to sec. 66.46, Stats. 1989–90, do not constitute debt within the meaning of art. XI, sec. 3, of the Wisconsin Constitution.[1]

For the reasons set forth below, we conclude that the City's TIF bonds for TID No. 4 to be issued pursuant to sec. 66.46, Stats. 1989–90, constitute debt within the meaning of art. XI, sec. 3, Wis. Const.

This case comes before us on stipulated facts.[2] The controversy arises from the City's creation on June 13, 1988, of Tax Incremental District No. 4 (TID No. 4). TID No. 4 consists of approximately 1,120 acres sited for an industrial project. To pay a portion of the project costs associated with TID No. 4, the City of Hartford issued $4,155,000 of general obligation anticipation notes. As of May 14, 1991, as a result of this borrowing, the City was left with less than $2,000,000 in general obligation borrowing capacity within its constitutional

[1] Pursuant to sec. 806.04(11), Stats. 1989–90, the parties advised the office of the Attorney General of the suit; the attorney general declined to participate.

[2] In the course of briefing the issue of whether sec. 66.46(9)(b)1 constitutionally exempts TIF bonds from the municipal bond debt limit, the parties disagreed about the proper interpretation of the wording of a particular provision in the Hartford bond resolution. The City amended the resolution to avoid this dispute and to ensure that the case presented a legal issue of state-wide concern.

debt limit. On that date, the Common Council of the City of Hartford authorized the issuance of $2,300,000 in TIF bonds for TID No. 4. The City had not previously issued TIF bonds. Banc One Capital Corporation (Banc One) offered to act as underwriter and purchase the TIF bonds subject to execution of a bond purchase agreement by the mayor and the city clerk.

In May 1991, the mayor and city clerk sought a legal opinion from the city attorney to confirm that the TIF bonds would not constitute an indebtedness of the City for purposes of the constitutional debt limitation. On May 21, 1991, the city attorney concluded that the issuance of the TIF bonds would constitute debt and would violate the constitutional limitation on debt under art. XI, sec. 3, Wis. Const.

Upon receipt of the city attorney's opinion, the mayor and city clerk informed the Common Council of the City of Hartford that they would not sign the bond purchase agreement. Banc One refused to purchase the TIF bonds until it received a definitive ruling that the bonds would not result in an unconstitutional issuance of debt. The Common Council of the City of Hartford retained counsel to commence this original action seeking a declaration that TIF bonds issued pursuant to sec. 66.46 are exempt from the constitutional debt limitation of art. XI, sec. 3. To date, the parties have held steadfast in their positions: The mayor and city clerk refuse to sign the purchase agreement, and Banc One refuses to purchase the TIF bonds in the absence of a definitive ruling on the debt question.

First we summarize the statutes creating tax incremental districts. Then we discuss whether the City's TIF bonds for TID No. 4 issued pursuant to the statutes are debt under the constitution.

196

## I.

Section 66.46 of the Wisconsin statutes, adopted in 1975,[3] authorizes cities and villages to create tax incremental districts[4] to assist them in financing public improvement projects in areas which are "blighted" (sec. 66.435(3), Stats. 1989-90), in need of "rehabilitation or conservation work" (sec. 66.435(3), Stats. 1989-90) or suitable for "industrial sites" (sec. 66.52, Stats. 1989-90). Prior to creating a district, the municipality must take a number of preliminary steps, including

[3] Chapter 105, Laws of 1975. For this court's description of sec. 66.46, see *Sigma Tau Gamma Fraternity House v. Menomonie,* 93 Wis. 2d 392, 288 N.W.2d 85 (1980). Although tax incremental financing has been widely used throughout Wisconsin since the enactment of sec. 66.46, we are advised by the City of Hartford that it is the first municipality that seeks to issue TIF bonds in an amount which, were the bonds to constitute debt, would cause the City to exceed the constitutional debt limit. The amici curiae brief of the City of Madison and League of Wisconsin Municipalities asserts that since 1975 Wisconsin cities and villages have created over 500 tax incremental districts.

For discussions of tax incremental financing and the debt issue, *see, e.g.,* Christina G. Dudley, *Tax Incremental Financing for Redevelopment in Missouri: Beauty and the Beast,* 54 U.M.K.C. L. Rev. 77 (1985); Jonathan M. Davidson, *Tax-Related Development Strategies for Local Government,* 13 Real Estate L.J. 121 (1984); Jonathan M. Davidson, *Tax Increment Financing as a Tool for Community Redevelopment,* 56 J. Urban L. 405 (1979); John E. Anderson, *Tax Increment Financing: Multiple Adoption and Growth,* 43 Natl Tax J. 155 (1990).

[4] Section 66.46, Stats. 1989-90, defines the term "tax incremental district" as a "contiguous geographic area within a city defined and created by resolution of the local legislative body, consisting solely of whole units of property as are assessed for general property taxes purposes, other than railroad rights-of-way, rivers or highways . . .."

197

designating the boundaries of the tax incremental district (sec. 66.46(4)(b), Stats. 1989–90), preparing and adopting a proposed project plan for the district (sec. 66.46(4)(f), Stats. 1989–90), and gaining the approval of a joint review board whose membership is prescribed by the statute (sec. 66.46(4m), Stats. 1989–90). The decision of the joint review board about whether the municipality should proceed with the district must be based upon a number of factors, including whether the development expected in the district would occur without the use of tax incremental financing (sec. 66.46(4m)(c)1a, Stats. 1989–90). In the case at hand, the parties agree that the City has satisfactorily fulfilled all the procedural requirements.

This case concerns the proposed financing of the development within TID No. 4. The tax increment law, sec. 66.46(9), Stats. 1989–90, gives a municipality several options for financing development in a tax incremental district. Among these options is the method chosen by the City, the issuance of TIF bonds. Section 66.46(9)(a)8, Stats. 1989–90.

Financing through TIF bonds is premised on the assumptions that increased tax revenue will be generated by development in the tax incremental district and that this increased tax revenue will be sufficient to pay the holders of TIF bonds in full. The process by which a municipality levies and collects property taxes is not altered by the creation of a tax incremental district. The municipality remains free to adjust the annual rate of taxation and all property owners pay the same tax rate without regard to whether they are located inside or outside of the TIF district. The statutory framework for achieving this result is described briefly below.

198

When a municipality creates a tax incremental district, the Wisconsin department of revenue determines the aggregate equalized value of all taxable property within the district. Section 66.46(5)(b), Stats. 1989–90. This beginning value is termed the "tax incremental base." Section 66.46(2)(j), Stats. 1989–90. Annually thereafter, the department recalculates the aggregate equalized value of all taxable property in the district. Section 66.46(5)(g), Stats. 1989–90. This latter figure less the tax incremental base is termed the "value increment." Section 66.46(2)(m), Stats. 1989–90. The value increment represents the increase (or decrease) of the aggregate equalized property value that has occurred in the tax incremental district since its creation.

The value increment is then used to calculate the incremental tax revenues (the tax increment) which, at least in theory, are attributable to development in the tax incremental district. To calculate incremental tax revenues, the total local general property taxes levied on all taxable property within the district in a year are multiplied by a fraction having as its numerator the value increment for that year in that district and as its denominator that year's aggregate equalized value of all taxable property in the district. Section 66.46(2)(i), Stats. 1989–90.[5]

In the years following the creation of a tax incremental district, all incremental tax revenues collected in

---

[5] The incremental tax revenues are thus computed according to the following formula:

Total General Taxes Levied on all Taxable Property Within Tax Incremental District X

$$\frac{\text{Aggregate Equalized Value of Taxable Property Within District less Tax Incremental Base}}{\text{Aggregate Equalized Value}}$$

the tax incremental district must be deposited into a special fund for that district. Section 66.46(6)(c). The special fund may thus include incremental tax revenues received after the district is created but before the TIF bonds are issued. Section 66.46(6)(am)4, Stats. 1989-90.[6] The municipality may, but is not required to, deposit additional money into the special fund. Section 66.46(6)(c), Stats. 1989-90.

No monies may be paid out of the special fund except to pay project costs of the district, to reimburse the municipality for the payment of project costs, or to satisfy the claims of holders of bonds issued with respect to the district. Section 66.46(6)(c), Stats. 1989-90. The extent of a TIF bondholder's claim against the special fund, and against the municipality itself, is spelled out in section 66.46(9)(b)4. The TIF bonds are payable only out of the special fund created under sub. (6)(c). Each TIF bond shall contain the statements necessary to show that it is only payable out of the special fund and that it does not constitute an indebtedness of the municipality or a charge against its general taxing power. Under the statute the local legislative body shall irrevocably pledge all or a part of such special fund to the payment of such bonds or notes.[7]

---

[6] The brief of amici curiae, the City of Madison and the League of Wisconsin Municipalities, asserts that unlike in many tax incremental financings, the special fund in the case at hand will not contain any money at the time the TIF bonds are issued.

[7] Section 66.46(9)(b)4, Stats. 1989-90, provides: "Tax incremental bonds or notes are payable only out of the special fund created under sub. (6)(c). Each such bond or note shall contain such recitals as are necessary to show that it is only so payable and that it does not constitute an indebtedness of such city or a charge against its general taxing power. The local legislative body shall irrevocably pledge all or a part of such special fund to the

Several other passages of section 66.46 are relevant to an understanding of the nature of the TIF bonds. Section 66.46(7), entitled "Termination of Tax Incremental Districts," provides that the tax incremental district shall terminate when the earliest of three events occurs. One such event is dissolution of the district by the local legislative body. Upon dissolution of the district the municipality becomes liable for all unpaid project costs actually incurred which are not paid from the special fund. The statute expressly provides that the municipality's termination of the district does not make the municipality liable for any TIF bonds issued.[8]

---

payment of such bonds or notes. Such special fund or the designated part thereof may thereafter be used only for the payment of such bonds or notes and interest thereon until the same have been fully paid; and a holder of such bonds or notes or of any coupons appertaining thereto shall have a lien against such special fund for payment of such bonds or notes and interest thereon and may either at law or in equity protect and enforce such lien."

Section 5 of the City of Hartford's amended bond resolution contains the following recitals: "The Bonds, together with interest thereon, shall not constitute an indebtedness of the City or a charge against its general taxing power. The Bonds, together with the interest thereon, shall be payable only out of the Special Fund created with respect to the District pursuant to Section 66.46(6)(c) of the Wisconsin Statutes and shall be a valid claim of the holder thereof only against such Special Fund, as hereinafter provided."

The brief of amici curiae, the City of Madison and the League of Wisconsin Municipalities, asserts that unlike in many tax incremental financings, the City of Hartford will not pledge the entire fund to support debt service on the bonds.

[8] Section 66.46(7), Stats. 1989–90, provides:

"The existence of a tax incremental district shall terminate when the earlier of the following occurs:

201

Also relevant is the legislature's apparent recognition that, given the uncertain nature of a TIF bondholder's claim against the municipality, the municipality may need to make additional pledges of security in order to attract bond purchasers. Section 66.46(9)(b)5 Stats. 1989–90. Thus, "to increase the security and marketability of tax incremental bonds," the legislature explicitly authorizes a municipality to take actions, "not inconsistent with the Wisconsin constitution," to make the bonds more secure or otherwise to increase their marketability.[9] The City apparently exercised this statutory option when it promised in the amended bond resolution that the City would "take no action . . . to terminate the District prior to discharge and satisfaction of the Bonds." By making this promise, the City's obligation to deposit monies into the special fund may thus be abso-

---

(a)   That time when the city has received aggregate tax increments with respect to such district in an amount equal to the aggregate of all project costs under the project plan and any amendments to the project plan for such district.

(am)   Sixteen years after the last expenditure identified in the project plan is made.

(b)   The local legislative body, by resolution, dissolves the district at which time the city shall become liable for all unpaid project costs actually incurred which are not paid from the special fund under sub. (6)(c), except this paragraph does not make the city liable for any tax incremental bonds or notes issued."

See note 10 *infra.*

[9] Section 66.46(9)(b)5, Stats. 1989–90, provides:

"To increase the security and marketability of tax incremental bonds or notes, the city may: . . . Make such covenants and do any and all such acts, not inconsistent with the Wisconsin constitution, as may be necessary or convenient or desirable in order to additionally secure bonds or notes or tend to make the bonds or notes more marketable according to the best judgment of the local legislative body."

lute for 23 years if the City does not repay the bonds before that time.[10]

Finally, and central to this controversy, is sec. 66.46(9)(b)1 which states that TIF bonds "shall not be included in the computation of the constitutional debt limitation of the city."

## II.

The desirability of the proposed project is not at issue, nor is the need to enable municipalities to finance public improvements in an equitable manner. The parties come before the court disputing whether the City's TIF bonds for TID No. 4 are to be considered as debt for purposes of the constitutional debt limitation.

Notwithstanding the legislature's recital that TIF bonds do not constitute a debt within the meaning of the constitution, the court must examine the substance of the obligations to ascertain their effect under art. XI,

---

[10] The 23 year calculation appears in sec. 66.46(6)(a) and can also be reached by reading secs. 66.46(7) and 66.46(6)(am) together. Section 66.46(6)(a) provides that the department of revenue shall allocate the tax increment to the municipality that created the district until it receives notice of the district's termination or 23 years after the district was created, whichever event occurs first.

Section 66.46(7), set forth at note 8, provides, *inter alia,* that the district shall terminate 16 years after the last expenditure identified in the project plan is made. Section 66.46(6)(am) provides that "no expenditures may be made later than 7 years after a district is created." The two provisions, taken together, give districts a maximum life of 23 years. Limited exceptions exist with respect to expenditures incurred under ch. 33 and expenditures authorized under an amended project plan. Section 66.46(6)(am)2a&b.

sec. 3. The legislature's characterization of the bonds is not controlling on this court's determination of the constitutional issue.

Article XI, sec. 3(2), of the Wisconsin Constitution limits the power of cities to become indebted, stating:

> (2)   No county, city, town, village, school district, sewerage district or other municipal corporation may become indebted in an amount that exceeds an allowable percentage of the taxable property located therein equalized for state purposes as provided by the legislature. In all cases the allowable percentage shall be 5 percent except as specified in pars. (a) and (b) . . ..

The history of the Wisconsin constitutional provisions concerning municipal debt manifests both an abhorrence of public debt and a willingness to increase the debt, especially for school purposes. *Dieck v. Unified School District of Antigo,* 165 Wis. 2d 458, 468, 477 N.W.2d 613 (1991). This constitutional debt limitation seeks to ensure that a political subdivision does not become overburdened by obligations. Article XI, sec. 3(2), is intended to prevent the creation of excessive municipal debt and to protect taxpayers from the consequent oppression of burdensome, if not ruinous, taxation. It seeks to impose the burden of debt repayment upon those who create the obligations, not upon future generations.[11]

---

[11] *School District v. Marine National Exchange Bank of Milwaukee,* 9 Wis. 2d 400, 404, 101 N.W.2d 112 (1960). *See also State ex rel. LaFollette v. Stitt,* 114 Wis. 2d 358, 372, 338 N.W.2d 684 (1983); *Dieck,* 165 Wis. 2d at 468–469.

This court has acknowledged that the constitution does not prohibit creative financing. It is not an illegal evasion of the constitution "to accomplish a desired result, lawful in itself, by finding a legal way to do it." *State ex rel. Thomson v. Giessel,* 271 Wis. 15, 42, 72 N.W.2d 577 (1955). The issue is whether, through tax incremental financing pursuant to sec. 66.48, the City has found a legal way to raise funds for property improvements without incurring constitutional debt.

Over the years this court has frequently been called upon to determine whether a particular municipal financing plan constituted debt within the meaning of art. XI, sec. 3(2). Each new, creative financing technique has been judged according to its own attributes, its similarity to other financing arrangements the court has examined, and the objectives of the constitutional debt limit.

Nearly a century ago the court observed that there is nothing technical about the meaning of debt in its constitutional sense. "It includes all absolute obligations to pay money, or its equivalent, from funds to be provided, as distinguished from money presently available or in the process of collection and so treatable as in hand." *Owen v. Donald,* 160 Wis. 21, 59, 151 N.W. 331 (1896).[12]

---

[12] In another case from that era, we articulated a similarly straight-forward approach. "There is no doubt of the meaning of the term 'debt' as used in the law. It means 'something owed;' 'money due or to become due upon express or implied agreement.' . . . It denotes not only an obligation on the part of the debtor to pay, but the right of the creditor to receive and enforce payment." *Burnham v. City of Milwaukee,* 98 Wis. 128, 132, 73 N.W. 1018

Our cases have identified several indicia of debt in the constitutional sense.[13] The City asserts that two of these indicia demonstrate that no debt has been created in this case: 1) the City may avoid its obligation and 2) the obligation is not enforceable against the City or its assets.

We agree with the City that it may avoid any further obligation under the TIF bonds if, when the district terminates, the special fund is not sufficient to pay the bondholders in full. We also agree with the City that the bondholders' right to payment cannot be enforced against the City or any of its assets other than the special fund. Nevertheless, during a period possibly as long as 23 years from the creation of the district, the City has a financial obligation it does not have the power to avoid. The City must pay over part of its general property tax revenues to the TIF bondholders by allocating any tax increments from the district to the special fund. As we shall explain more fully below, these characteris-

---

(1897), quoted with approval in *State ex rel. Hammermill Paper Co. v. LaPlante*, 58 Wis. 2d 32, 66, 205 N.W.2d 784 (1973).

[13] A review of these factors can be found in William J. Kiernan, Jr., *Wisconsin Municipal Indebtedness: Part 1—The Power to Become Indebted And Its Limits*, 1964 Wis. L. Rev. 173. Attorney Kiernan noted the following with respect to judicial definitions of debt in Wisconsin: "Several logical elements of debt may readily be identified. First, debt is an undertaking to pay money or its equivalent. Thus, the fact that a municipality must certainly provide some municipal service does not create a present debt, even though it will require the expenditure of money. Second, debt is a voluntary undertaking. . . . Third, debt must be certain in amount. Fourth, it must be an absolute undertaking; if the municipality may avoid its obligation or if there remain conditions precedent to it, there is no indebtedness. . . . Fifth, it must be an undertaking enforceable by the creditor against the municipality or its assets." 1964 Wis. L. Rev. at 197.

tics of the City's TIF bonds distinguish them from other financing techniques which this court has found not to be debt.

In attempting to persuade us that the TIF bonds are not debt, the City points out similarities between its TIF bonds and other financing arrangements which the court has found not to be debt under the constitution.

The City compares its TIF bonds to obligations secured by special assessments. Debts secured by special assessments (as authorized by statute) are incurred for special improvements and are financed by a special tax on the properties they benefit. The obligations do not burden any property of the municipality other than the revenues from the special assessment tax pledged as repayment. *Fowler v. City of Superior,* 85 Wis. 411, 54 N.W. 800 (1893). This kind of obligation does not constitute debt under art. XI, sec. 3(2). We agree with the City that there are similarities between its TIF bonds and obligations payable from special assessments. Like a special assessment, tax incremental financing holds a designated district responsible for paying the costs of localized improvements.

However, the differences between the TIF bonds and obligations payable from special assessments outweigh the similarities. Unlike special assessments, which are generated in addition to general property taxes, tax increments are not independent sources of revenue. Nor does tax incremental financing involve a special tax; the tax incremental district has no taxing power, and the municipality does not impose any special taxes to pay off TIF bonds. Rather, the City will collect tax increments as a part of its general property taxes; the general property tax is the source of the revenue in the special fund. In contrast, no part of the funds raised through special

assessments is part of the general property tax revenue. 15 McQuillin, Municipal Corporations secs. 41.31 and 41.32 (3d ed. 1985 rev. ed.).

In addition, funds derived from special assessments cannot be used to pay the general expenses of a municipality. When the municipality repays its obligation from monies collected by special assessments on the properties benefiting from the improvements, its general property tax revenues are not affected. In contrast, the special fund created to repay TIF bonds is derived from general property taxes and could be used to meet other expenses, were the use of the special fund not expressly limited by statute.

The City next analogizes TIF bonds to revenue obligations in which the project (which is acquired or constructed with proceeds from the sale of the obligations), as well as the revenues generated by the project, are the sole security for the obligations. In both revenue obligations and TIF bonds, the municipality has an absolute obligation to pay, but its obligation is limited to payment from specified sources. Our court has held that obligations payable solely out of the property acquired or constructed, or out of revenue generated from the project, are not debt. Revenue obligations are an aspect of the pre-existing asset doctrine. According to the pre-existing asset doctrine, an obligation is not debt in the constitutional sense if it is neither 1) a general obligation of the municipality entitling the creditor to look to the municipality's revenue for repayment nor 2) secured by any asset owned by the municipality prior to its incurring the obligation.

In *State ex rel. Morgan v. City of Portage,* 174 Wis. 588, 184 N.W. 376 (1921), a state statute enabled cities to issue bonds to purchase new utility plants or to improve existing plants. The bonds were to be paid from

revenue generated by the utility itself and were secured by a mortgage on the plant. When determining whether these bonds did in fact represent debt for constitutional purposes, the court distinguished bonds issued to purchase or construct a new plant from those used to finance improvements to an existing plant. With the former, debt was not created because the city had not encumbered any assets owned prior to issuance of the bonds. As to the latter, the city was indebted under the constitution because the bondholders could lay claim to a pre-existing asset of the city, the utility plant.

The court reached the same conclusion in *State ex rel. Hammermill Paper Co. v. LaPlante*, 58 Wis. 2d. 32, 205 N.W.2d 784 (1973). Construing a financing scheme similar to that in *Morgan*, the court declared that "Where the purchase price for property to be acquired by a municipality is payable exclusively from income or profits to be derived from the property purchased and a mortgage or lien attaches only to the property purchased, no debt is created within the meaning of art. XI, sec. 3. However, where a mortgage is imposed on property existing or already owned by the municipality to secure the purchase price, municipal debt is created within the meaning of art. XI, sec. 3." *Hammermill*, 58 Wis. 2d at 67.

The City argues that under the tax increment statute, the tax incremental district itself is analogous to the revenue producing enterprise under revenue obligations. We view the two types of obligations as dissimilar because of the nature of the funds from which they are paid. The infrastructure constructed with the funds raised through the City's TIF bonds does not generate revenue directly. This dissimilarity is critical.

The City brushes over this essential dissimilarity, emphasizing instead what it considers the core of the

pre-existing asset doctrine and the fundamental similarity between TIF bonds and revenue obligations. The City argues that the pre-existing asset doctrine rests on the principle that a municipality does not create debt when the municipality can walk away from a transaction none the poorer for having entered into it.[14] According to the City, its TIF bonds are not debt in the constitutional sense because the City can pay its bondholders and be no worse off for having entered into the transaction. The City argues that its TIF bonds are not debt because, absent the creation of the tax incremental district, the tax increments deposited to secure the TIF bonds would not exist.[15] The City asserts that the TIF bonds are thus comparable to revenue obligations because both are paid from revenues that would not be available to the City *but for* the improvements funded by

---

[14] William J. Kiernan, Jr., *Wisconsin Municipal Indebtedness: Part 1—The Power to Become Indebted And Its Limits,* 1964 Wis. L. Rev. 173, 208–09. *See, e.g., Burnham v. City of Milwaukee,* 98 Wis. 128, 73 N.W. 1018 (1897);*Connor v. Marshfield,* 128 Wis. 280, 107 N.W. 639 (1906); *State ex rel. Morgan v. Portage,* 174 Wis. 588, 184 N.W. 376 (1921); *Meier v. City of Madison,* 257 Wis. 174, 42 N.W.2d 914 (1950); *State ex rel. Thomson v. Giessel,* 267 Wis. 331, 65 N.W.2d 529 (1956); *Morris v. Ellis,* 221 Wis. 307, 266 N.W. 921 (1936); *State ex rel. Hammermill Paper Co. v. LaPlante,* 58 Wis. 2d 32, 205 N.W.2d 784 (1973); *Dieck v. Unified School District of Antigo,* 165 Wis. 2d 458, 477 N.W.2d 613 (1991).

[15] Section 66.46(4m), Stats. 1989–90, provides that the joint review board shall base its decision to approve or deny a proposal for a tax incremental district on the factors, one of which is:

> a. whether the development expected in the tax incremental district would occur without use of tax incremental financing . . ..

The joint review board in this case explicitly found that the development would not occur without use of tax incremental financing.

the liability incurred.[16] The crux of the City's position is that regardless of the source of the monies pledged to secure the TIF bonds, the monies would not exist absent the creation of the TIF district.[17]The City's argument

[16] The City further explains that pursuant to sec. 66.46(6)(c), Stats. 1989–90, and sec. 6 of the Hartford's amended bond resolution, while the district is in existence, the City never obtains true ownership of or dominion over the increments. The City contends that the increments do not become an asset of the city, because all tax increments are deposited into the special fund to pay the project costs and the TIF bonds. The tax increments, according to the City, are deemed "paid" toward project costs and debt service on the TIF bonds retroactive to the time the district is created. Thus the revenues are not a pre-existing asset.

[17] The amici curiae brief of the City of Madison and League of Wisconsin Municipalities also argues that the TIF bonds are not debt because they are revenue obligations issued for a public utility. The Wisconsin constitution exempts certain types of public utility financing from the constitutional debt limitation. Article XI, section 3, clause 5 of the state constitution provides:

> An indebtedness created for the purpose of purchasing, acquiring, leasing, constructing, extending, adding to, improving, conducting, controlling, operating or managing a public utility of a town, village, city or special district, and secured solely by the property or income of such public utility, and whereby no municipal liability is created, shall not be considered an indebtedness of such town, village, city or special district, and shall not be included in arriving at the debt limitation under sub. (2).

Hartford's TIF bonds do not fall within the public utility exemption. First, as we have already explained, the TIF bonds in this case are not "secured solely by the property or income of such public utility" as required by the constitution, but rather are secured solely by general property tax revenues.

Second, sec. 66.066(1)(b), Stats. 1989–90, upon which the brief relies, defines "public utility" as "any revenue producing facility or enterprise owned by a municipality and operated for a public purpose . . .." Assuming *arguendo* that the tax receipts in

211

does not consider that an increase in land value may occur without the development project because of inflation or because of improvements unrelated to the project.

Even assuming, *arguendo,* that the tax increments would not have existed but for the district's creation, we conclude that the City's TIF bonds for TID No. 4 constitute debt because they are payable solely from general property tax revenue. This court has in the past recognized a distinction between the pledging of general tax revenues and the pledging of project revenues. For instance, in *Burnham,* 98 Wis. at 133, the court recognized that there was authority for the proposition that "a borrowing of money upon a . . .. charge upon the public revenue, constitutes debt." In *Connor v. Marshfield,* 128 Wis. 292, 107 N.W. 639 (1906), we stated that the municipality's bonds were not debt because "the city could not be coerced by the creditor of its grantor into applying to his claim its general revenue . . .." Similarly, in *Hammermill,* 58 Wis. 2d at 65, we stated that "when no funds or property acquired by taxation are involved, and the mortgage is payable solely out of the revenues of the project, the giving of a mortgage upon the property so acquired from the proceeds of the bonds to be sold

---

this case could be classified as "revenue" for purposes of sec. 66.066(1)(b) they are not generated by a facility or enterprise owned by the City.

Third, the amici argue that the reference in sec. 66.46(9)(a)6 to revenue bonds issued "under s. 66.066" means that the legislature has classified tax incremental districts as public utilities for financing purposes. Rather than thoroughly dissect this proposition, we simply note that this case concerns Hartford's proposed issuance of TIF bonds under sec. 66.46(9)(a)8, not sec. 66.46(9)(a)6.

does not make the bonds 'debts' of the city within the meaning of art. XI, sec. 3."

In other states having tax incremental financing laws and constitutional debt provisions similar to those in Wisconsin, courts have held that the pledging and use of general property tax revenue to meet TIF bond obligations creates debt under their constitutions. See, *e.g.*, *Richards v. City of Muscatine*, 237 N.W.2d 48 (Iowa 1975) (urban renewal bonds would constitute a constitutional debt if they were payable from the general revenues of the city without limitation; the result is the same when a statue carves out a portion of a city's general revenues); *City of Tucson v. Corbin*, 128 Ariz. 83, 623 P.2d 1239 (Ct. App. 1981) (if a state undertakes or agrees to provide any part of a fund through a general tax, securities issued on the credit of the fund are issued on the credit of the state); *Meierhenry v. City of Huron*, 354 N.W.2d 171 (S.D. 1984) (the credit of a city is its power to levy general taxes; when a city pledges part of that power, it pledges its credit and incurs debt); *Miller v. Covington Development Authority*, 539 S.W.2d 1 (Ky. 1976) (the general property tax is the ultimate resource of a city's fiscal integrity; an obligation payable from it is a debt within the meaning of the Constitution); and *In Re Request for Advisory Opinion on Constitutionality of 1986 PA 281*, 422 N.W.2d 186 (Mich. 1988) (tax increment bonds bring into play the general taxing power of a municipality and thus constitute a loan of its credit). We are persuaded by the reasoning of these courts. They conclude, as we do, that general property tax revenues as the source of payment of the City's TIF bonds for TID No. 4 render these bonds debt under the constitution.[18]

---

[18] The City refers us to cases from other jurisdictions in which, according to the City, courts have reached outcomes oppo-

If the City's TIF bonds for TID No. 4 were payable directly from the general property tax revenues of the City, they clearly would constitute debt under art. XI, sec. 3. The result should not be different because the tax increment statute and the TIF bond declare that TIF bonds for TID No. 4 shall be paid from only part of the general tax revenues. Tax increments are collected as general property tax revenues. The tax increment statute merely allows a municipality to carve out a portion of its

site to that which we reach today. A closer look at these cases reveals that the cases are not pertinent.

For instance, in *South Bend Public Transportation Corp. v. City of South Bend,* 428 N.E.2d 217 (Ind. 1985), the court held that the urban renewal area in question was a special taxing district to which the constitutional debt limit was not applicable. A similar outcome was reached in *Tribe v. Salt Lake City Corporation,* 540 P.2d 499, 503 (Utah 1975), in which the court concluded that the tax incremental district was a quasi-municipal corporation not subject to constitutional debt limits.

The city of Denver's claim that tax incremental financing increased its debt load was rejected in *Denver Urban Renewal Authority v. Byrne,* 618 P.2d 1374, 1382 (Colo. 1980), in part because the court concluded that the obligation was not that of Denver but that of the Urban Renewal Authority.

In *Wolper v. City Counsel of Charleston,* 287 S.C. 209, 336 S.E.2d 871, 874 (1985), the court held that the issuance of tax incremental bonds secured by ad valorem taxes did not constitute debt because the South Carolina constitution explicitly authorized such bonds. In *State v. City of Daytona Beach,* 484 So.2d 1214 (Fla. 1986), the question of whether the bonds constituted debt was not addressed.

The City's assertion notwithstanding, we conclude that the weight of relevant authority supports the position we adopt today.

214

general property tax revenues for payment of the debt service on its TIF bonds for TID No. 4.[19]

The issuance of the TIF bonds for TID No. 4 obligates the City to pay the holders of the bonds from funds collected through the exercise of the general taxing power of the City. Thus, the City's general taxing power is the real security for the TIF bonds. The City's obligation to deposit monies in the special fund is the source of credit supporting the decision of investors to purchase the TIF bonds. The City's credit is its power to levy

[19] As a result of the tax incremental district a smaller tax base must pay for the expenses of government. The effect of the tax incremental district is to siphon away property tax revenue from the municipality. Every taxing authority in which the TIF district is located, such as counties, vocational technical and adult education districts, and lake protection districts would have to impose higher taxes on all property in order to raise sufficient funds to pay their expenses. Thus a burden for the improvements in the tax incremental district may fall on taxpayers who own property outside the district. The validity of this argument is demonstrated by the legislature's creating a special program to shield school districts from the increased costs resulting from a tax incremental district and an inability to use the tax increments. *See* sec. 121.085, Stats. 1989–90.

The legislature apparently recognized the danger of cities carving out large portions of their tax revenue for commitment to special funds when it required local legislative bodies to find, prior to approving a TIF district, that either 1) the equalized value of taxable property in the proposed district would not exceed 7 percent of the total equalized value of all taxable property within the city or 2) the equalized value of taxable property of the district plus the value increment of all existing districts within the city does not exceed 5 percent of the total equalized value of taxable property within the city. Section 66.46(4)(gm)4c, Stats. 1989–90. This statutory limitation does not, however, in any way limit the amount of debt a municipality can incur through investment in TIF district improvements.

general property taxes. Accordingly, when the City issues its TIF bonds for TID No. 4 and pledges a part of its power to levy general property taxes, it pledges its credit.

The very fact that the constitutional debt limit is calculated as a percentage of the taxable property located within a municipality's boundaries shows that the drafters of the constitutional provision were concerned about a municipality's incurring excessive obligations to be paid out of general property tax revenues. To hold that TIF bonds payable from the general property tax revenues are not debt would permit the City to commit large portions of its general property tax revenues to special funds without regard to the constitutional debt limitation in art. XI, sec. 3. Such a holding would virtually nullify the constitutional debt limitation. Accordingly, we conclude that by pledging all or a part of its power to levy general property taxes to pay the TIF bonds for TID No. 4, the City is incurring debt in the constitutional sense.

We conclude that the proposed tax incremental financing for TID No. 4 based on general property taxes represents a "carving out" from the City's general property tax revenues of a discrete source of revenue that is "absolutely obligated" for a significant period of time to the retirement of the TIF bonds for TID No. 4.[20] The

---

[20] The parties did not discuss in their briefs or at oral argument the City's relinquishing the statutory right to terminate the tax incremental district at any time or the constitutional significance of this aspect of the resolution in light of our recent decision in *Dieck v. Unified School District of Antigo,* 165 Wis. 2d 458, 477 N.W.2d 613 (1991). Briefly, in *Dieck* the school district could avoid further obligations under the agreement simply by opting in any year not to appropriate the necessary funds. We expressly reserve opinion on whether Hartford's TIF bonds would

resulting impairment of the City's general property tax revenues to pay TIF bond obligations for TID No. 4 for this period creates debt within the meaning of art. XI, sec. 3, of the Wisconsin constitution.

For the reasons set forth, we conclude that the TIF bonds the City of Hartford proposes to issue for TID No. 4 under sec. 66.46, Stats. 1989–90, constitute debt within the meaning of art. XI, sec. 3, Wis. Const.

*By the Court.*—Rights Declared.

Justice DONALD W. STEINMETZ, took no part.

constitute debt had the City retained the right to terminate the tax incremental district at any time. That question is not before us. We raise this issue and the *Dieck* case to provide a more thorough understanding of the basis and reach of the holding in the case at bar.